(No. 48375.—)

KAREN GILLILAND, Appellee, v. BOARD OF EDUCA-
TION OF PLEASANT VIEW CONSOLIDATED
SCHOOL DISTRICT NO. 622 OF TAZEWELL
COUNTY, Appellant.

*Opinion filed April 5, 1977.*

144

Moehle, Reardon, Smith & Day, Ltd., of Washington, for appellant.

Drach, Terrell & Deffenbaugh, of Springfield, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Karen Gilliland, a tenured elementary teacher in Pleasant View Consolidated School District No. 622, Tazewell County, was dismissed from her position by the board of education following a public hearing. The Tazewell County circuit court, acting pursuant to the teacher's complaint for administrative review (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*), affirmed the decision of the board. On appeal the Appellate Court for the Third District reversed (35 Ill. App. 3d 861), and we allowed the board's petition for leave to appeal.

Since the major question is whether the findings of the board are contrary to the manifest weight of the

evidence, a detailed statement of facts is necessary. Pleasant View Consolidated School District No. 622 embraces a rural area which, during the 1972-73 school year, contained 57 families and from which 111 children attended the school. Plaintiff's employment at Pleasant View School had commenced with the 1969-70 school year and continued through the 1972-73 school year. During the first three years, she taught combined classes of second and third grades with 20 to 23 students. In 1972-73, she taught only a second grade class with 13 students. Plaintiff was married in September 1969 and divorced in May 1971.

In mid-March 1973, the board requested plaintiff to resign, but she refused. On March 30, 1973, the board gave her written notice that she was being dismissed for the following causes:

"1. Incompetency
 (a) ruining pupil's attitude toward school.
 (b) lack of teacher-pupil rapport. Pupils need clearer instructions on work.
 (c) irregular work assignments.
 (d) display of affection to compensate for previous harsh discipline.
 (e) general teaching incompetency.
2. Cruelty
 (a) grabbing pupils by arm, hair or shoulder.
 (b) having child sit on floor because she did not have her spectacles. The child's mother had sent a note informing you that her spectacles were being repaired.
 (c) harassing slow pupils and shouting at students.
 (d) uncontrollable temper.
3. Negligence
 (a) leaving your class unattended.
 (b) keeping pupils from recess and physical education class because school work was incomplete.
 (c) sending children to the library to complete work unassisted and unsupervised.
4. Best interests of school require your dismissal

> (a) parents allege your incompetency.
> (b) disciplinary methods and conduct as a teacher are too severe, affecting children's health and welfare."

Plaintiff requested a hearing on the charges and subsequently obstructed the view into her classroom by placing paper over the glass in the door and leaving it there for the remainder of the school year.

The testimony at the hearing indicates that plaintiff encountered various difficulties in her classrooms. Parents of children she taught made numerous complaints in regard to her teaching, and extensive proof was offered at the dismissal hearing. The parents of eight of her students testified about excessive homework assignments including as many as six subjects, requiring 3½ to 5 hours per night, grading other students' papers, reading an 80- to 90-page science book intended for fourth through seventh grade and preparing 10- to 15-page workbooks. The mothers of six students told or complained of having to write notes to the teacher certifying that their children had finished their homework. Some thought that she did not clearly explain assignments or give adequate instructions. Gerald Pullen, the superintendent, observed while evaluating plaintiff in November 1972 that she gave assignments while some students were out of the room, with the consequence that those students never received them. Four children testified they were required to miss recess and physical education in order to complete their schoolwork. Several persons, including children and adults, heard plaintiff shouting or yelling loudly at students in her class on occasions when the witnesses were in the building. There were numerous complaints of excessive physical contact or punishment inflicted on students by plaintiff. Several students testified she pulled their hair or grabbed them. Parents on two occasions observed her shaking a student. One boy was spanked for whispering; another was spanked three times in two days for lying. One mother complained her

daughter had been given a whipping, but plaintiff said she merely gave her the back of her hand on the bottom. One boy said he was struck by a book she threw at him, and plaintiff admitted hitting the boy with the book but denied throwing it. She employed unusual disciplinary measures and otherwise conducted herself in a manner said to demean or belittle the school children by requiring the students to tattle on their classmates when she was not present in the room; also, it was testified that students could not begin to eat at lunch or parties until everyone was ready, students were made to sit on the floor or stand with their noses against the wall as punishment, papers were thrown away if not in proper form, students could applaud only by tapping their index fingers together, plaintiff referred to one girl as "you fat kid," and, jokingly, she said, told one girl she wanted to take her home to clean her house. Several parents testified their children cried and were upset, began to hate school, feigned illness to avoid going to plaintiff's class, and otherwise exhibited signs of nervous tension. Stomach aches and headaches were frequent complaints. Parents of four children sent medication consisting of mild tranquilizers, aspirin, Pepto Bismol and Rolaids to school with their children to alleviate these problems. This medication was usually required by the children only while students in plaintiff's class. Three parents testified they did not want any of their children to ever have plaintiff as a teacher in the future. Substantively similar comments were made by other parents at board meetings.

Four parents testified in favor of the teacher and stated they had no complaints about her. Three of the parents who testified against plaintiff admitted writing a note or message to her indicating their approval of the good job she was doing. "You are wonderful, I like you" notes written by two of the complaining students were also admitted into evidence.

In the spring of 1972, two board members talked with plaintiff. She said they talked about her relationship with Superintendent Pullen and rumors that he was picking on her, how she liked her classroom and teaching two grades; and that they liked her sending home folders of papers for the parents to see. They also suggested she take a special summer course at Bradley University at board expense. When she asked, "Why me?" they responded, "We're talking to you, it was a good course." Byron Zehr, one of the two board members, testified that they also discussed her excessive shouting, keeping students in from recess or gym class, the unusual numbers of "bad days" she had during which she was "irritable and sharp," throwing away assignments not done in proper form, the notes parents had to send, keeping her personal problems out of the classroom, picking on a boy who needed special attention, personality conflicts with some students, and homework assignments. He testified that it was an open discussion on what should be done, but that they did not give any specific directives. When she asked "Why me?" concerning the course at Bradley, they told her it would help her with some of these problems. Plaintiff did not recall discussing any of those problems other than the notes from parents.

Plaintiff enrolled in and completed the Bradley course that summer, receiving an "A". Because of the problems during the 1971-72 year the board assigned only one grade to plaintiff for 1972-73. The reduced assignment was explained by Superintendent Pullen as "this would be her last opportunity as far as the Board was concerned, to show us she could do the job," although that was not communicated to her. On November 13, 1972, the superintendent discussed some of plaintiff's problems with her and gave her a letter regarding parental complaints and board concerns. The board had not directed him to take this action. The letter referred to six areas: excessive homework, lack of teacher-pupil rapport, children hating

school, excessive use of the lounge, being late for work, and leaving her class unattended. On November 14, 1972, a letter entitled "Board Concerns" was transmitted to her at the direction of the board. It asked if she required pupil tattling, had the janitor supervise her class, left class unattended, kept pupils in from recess and explained assignments clearly; it also stated that physical jerking on the first disciplinary contact might not be the best approach. At the dismissal hearing, the board found that plaintiff had corrected some items in the November 13 and 14 letters. She testified that Superintendent Pullen's vagueness and refusal to give specific instances in regard to the remaining items hindered her efforts to correct them as well.

Between November 19 and 22, the superintendent conducted a three-day classroom evaluation of plaintiff. His report contained several favorable comments indicating that the writing of assignments on the board was good, that discipline was excellent, that the class atmosphere seemed conducive to learning, that commendable efforts with slow students were being made, and that the national-heritage reading was worthwhile. In regard to her desire to learn to teach, the report stated, "I would judge this the best, as I have always found you open to constructive criticism." The report also contained criticisms and suggestions on technique, coffee and rest-room breaks, working too long individually with slow students, giving directions with two students out of the room, and disorganized class planning. On November 30 the superintendent wrote the following note: "Everything seems to be fine with the two parents now; keep up the good work, relax more, honest." He testified that, through personal observation and the receipt of parental complaints, he knew plaintiff continued to engage in a course of conduct after November 1972 resulting in many of the same problems as previously existed, including keeping students

from gym class, shouting and yelling, complaints of illness or crying by children, requiring homework notes, and striking children about the head and face.

The board found at the hearing that Gilliland had corrected the charges listed in No. 3 except for keeping pupils from gym class. The facts previously stated do indicate some support on behalf of each of the remaining charges.

Two expert witnesses testified at the dismissal hearing. Dr. Leo Bent, dean of the college of education, Bradley University, testified for the board. After being given a lengthy statement of hypothetical facts reflecting the testimony presented at the hearing, Dr. Bent gave the following opinion: "I would say that definitely some of the techniques and methods employed *** were not those that you would expect to find in a second grade classroom in a school in the State of Illinois." Dr. Bent based his opinion on three factors: "1. The knowledge and the ability to use that knowledge in teaching. 2. Her ability to develop an art of teaching, if you will. 3. The ability of the teacher to create an atmosphere that is conducive to learning." Dr. Bent discussed at length inadequacies in all three areas. In his opinion, the teacher's behavior is the kind which tends to discourage and frustrate the children. Counsel for the board asked Dr. Bent whether the behavior and methods of the teacher were remediable from an educational standpoint. Dr. Bent answered: "I do not believe that they are. A great many of the types of activities evidenced in the hypothetical indicate rather compulsive behavior at times. When one situation is remedied in terms of the educational, it seems that something else comes into the picture. I think that the general behavioral pattern of the teacher is such that these are not remedial [sic] from an educational standpoint."

W. R. Cordis, a retired school superintendent with 44 years of experience, testified for the teacher that discipline

is important and that it is preferable to "start out tough" and ease up. He spoke with approval of some of her methods. But he also admitted that homework should be rare and not exceed 30 minutes, that yelling should be infrequent, that paddling should only be for excess belligerence, and that other of her disciplinary methods were generally not good teaching practices.

Plaintiff's principal argument is that the board lacked jurisdiction to proceed · with the dismissal because the charges were all remediable and she had not been given the written warning and opportunity for correction contemplated by section 24—12 of the School Code (Ill. Rev. Stat. 1971, ch. 122, par. 24—12). The appellate court agreed and held that the board's finding that the causes on which the dismissal was based were not remediable was against the manifest weight of the evidence and reversed.

The board's findings are not, of course, immune from judicial review. The court function, however, is limited, and does not permit substitution of the court's judgment for that of the board. Rather, the board's findings must be sustained unless those findings are contrary to the manifest weight of the evidence. (*Fender v. School District No. 25* (1976), 37 Ill. App. 3d 736, 742; *Glover v. Board of Education* (1974), 21 Ill. App. 3d 1053, 1058, *aff'd on other grounds* (1975), 62 Ill. 2d 122.) The test in determining whether a cause for dismissal is irremediable is whether damage has been done to the students, faculty or school, and whether the conduct resulting in that damage could have been corrected had the teacher's superiors warned her. (*Yesinowski v. Board of Education* (1975), 28 Ill. App. 3d 119, 123.) Uncorrected causes for dismissal which originally were remediable in nature can become irremediable if continued over a long period of time. See, *e.g., Glover v. Board of Education* (1974), 21 Ill. App. 3d 1053, 1057; *Robinson v. Community Unit School District No. 7* (1962), 35 Ill. App. 2d 325, 332.

The record in this case contains considerable testimony of damage to plaintiff's students and to the school itself, including detailed expert testimony that the causes for dismissal were irremediable. There was evidence that the complained-of conduct of the teacher extended over a period of four school years despite numerous parental complaints culminating in discussions between plaintiff and her superiors concerning her conduct. It seems clear to us that the cumulative effect of the evidence is such as to preclude a holding that the board's findings are contrary to the manifest weight of that evidence.

Plaintiff argues that each of the charges forming the basis for her dismissal is similar to or the same as charges held by the appellate court to be remediable in other cases. Our review of those cases reveals them to be readily distinguishable, since most turn on the lack of proof of, or consideration of, remediability. One case, *Smith v. Board of Education* (1958), 19 Ill. App. 2d 224, does indicate the lack of discipline and control to be remediable. But many causes, when standing alone, may be remediable, whereas those same causes in combination with others may well be irremediable. Here, we think it clear that the combination of a number of causes plus the continuous nature of the conduct were a sufficient basis for a finding of irremediability. *Kallas v. Board of Education* (1973), 15 Ill. App. 3d 450, 454; *Glover v. Board of Education* (1974), 21 Ill. App. 3d 1053, 1057.) This is not a case where a board of education has sat idly by, permitting remediable causes to expand into irremediable ones and thus evaded the notice requirement of section 24—12 of the School Code.

Plaintiff also urges that section 24—12 of the School Code is unconstitutional in that a dismissal procedure whereby a school board acts as prosecutor, witness, judge and jury violates due process guarantees of both Federal and State constitutions. She argues that the seven-man

board in this case could not be an impartial tribunal because four wives and four children of current board members, one former board member, and one current and two former board employees were witnesses against her at the hearing, while seven other parents testified they were asked by the board or its superintendent if they had any complaints against her.

The provisions of section 24—12 relating to notice and hearing, apart from the board partiality issue, are not complained of, and it is clear that the board complied with the statutory requirements (Ill. Rev. Stat. 1971, ch. 122, par. 24—12). In fact, an attorney who had never represented the board or its members presided as a hearing officer during the hearing, ruling on objections by counsel for plaintiff and the board, even though the present statutory procedure for selecting a hearing officer was not then in effect. Subsequent to the explanation of due process requirements in *Perry v. Sindermann* (1972), 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694, and *Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701, our appellate courts have considered and rejected due process attacks similar to that made here. (*Fender v. School District No. 25* (1976), 37 Ill. App. 3d 736, 744; *Hagerstrom v. Clay City Community Unit School District No. 10* (1976), 36 Ill. App. 3d 1, 3.) While we are aware that some courts in other jurisdictions have questioned similar procedures, we believe the decision of the United States Supreme Court in *Hortonville Joint School District No. 1 v. Hortonville Education Association* (1976), 426 U.S. 482, 49 L. Ed. 2d 1, 96 S. Ct. 2308, 2316, has made extended discussion of this issue unnecessary. *Hortonville* held that Federal due process requirements did not disqualify a school board from deciding to terminate a teacher's employment where the board had been involved in earlier events upon which its present decision was based. The Supreme Court there

indicated its concern with the importance of leaving with the board the power given it by the legislature. Moreover, the evidence here does not, in our judgment, bear out plaintiff's allegations that the board was prejudiced against her. The record reflects commendable efforts on the part of the board to assist in remedying her deficiencies over a prolonged period of time before the board finally decided to dismiss her. It is inevitable in small, rural, school districts that in hearings of this type there will be testimony from some witnesses who have a relationship of some sort, whether it be familial, social, or vocational, with members of the board. While the present hearing-officer provisions of section 24—12 are certainly preferable, we are not inclined to hold the board in this case an improper tribunal absent a clear showing of actual prejudice to plaintiff. The evidence that, after charges had been brought against plaintiff, the board conducted an investigation and questioned parents to determine whether they had complaints about her simply does not, in our judgment, establish bias.

The plaintiff also argues that she should not be required to pay for a copy of the transcript as a condition to obtaining judicial review. Review of the board's decision is governed by the Administrative Review Act. (Ill. Rev. Stat. 1971, ch. 122, par. 24—16.) Section 10 of the Administrative Review Act provides for dismissal of plaintiff's case "[i]f the statute under authority of which the administrative decision was entered provides or requires that the plaintiff in the review proceeding shall pay to the agency the costs of preparing and certifying the record of proceedings before the agency ***" and the plaintiff fails to do so. (Ill. Rev. Stat. 1971, ch. 110, par. 273.) Because section 24—12 of the School Code states in part that "[e]ither party desiring a transcript of the hearing shall pay for the cost thereof" (Ill. Rev. Stat. 1971, ch. 122, par. 24—12), we hold the plaintiff was

properly required to pay for the transcript.

Lastly, plaintiff contends that her petition for a change of venue should have been granted. That petition was filed subsequent to the trial judge's ruling on the board's motion, based on section 10 of the Administrative Review Act, to dismiss the complaint. Such a petition, however, must be filed before the judge has ruled on any substantial issue in the case. (Ill. Rev. Stat. 1971, ch. 146, par. 3.) Because the board's motion to dismiss was a substantial question ruled on by the judge, his denial of the later petition for a change of venue was proper. *Swanson v. Randall* (1964), 30 Ill. 2d 194, 198.

The judgment of the Appellate Court for the Third District is accordingly reversed, and the judgment of the circuit court of Tazewell County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*