(No. 58075.-

THE BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 131, KANE COUNTY, Appellant, v. THE STATE BOARD OF EDUCATION *et al.*, Appellees.

*Opinion filed December 1, 1983.*

Richard L. Horwitz and David J. Chroust, of Drendel, Schanlaber, Horwitz & Oakes, and Lambert M. Ochsenschlager, Wayne F. Weiler and Craig S. Mielke, of Reid, Ochsenschlager, Murphy & Hupp, all of Aurora,

for appellant.

Wayne Schwartzman, of Hirsh & Schwartzman, P.C., of Chicago, for appellee Robert Slavin.

JUSTICE CLARK delivered the opinion of the court:

Defendant Robert Slavin was a tenured elementary school teacher in Kane County when he was discharged by plaintiff, the board of education of Kane County School District No. 131, for allegedly abusing students in his class. The defendant State Board of Education conducted a formal hearing pursuant to section 24—12 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 24—12). The hearing officer ordered Slavin reinstated, and the plaintiff filed suit in the circuit court of Kane County on November 12, 1980. The circuit court reversed the decision of the hearing officer and upheld the dismissal of defendant Slavin. The appellate court reversed (112 Ill. App. 3d 696), and we granted plaintiff's petition for leave to appeal (87 Ill. 2d R. 315(a)).

Robert Slavin had taught elementary school students in Kane County for 17 years prior to his dismissal in 1980. He had been employed at the Dieterich School since 1966 and was teaching a class of fourth graders when he began having serious disciplinary problems with four of his students. Slavin had an unblemished employment record prior to these disciplinary problems. His work performance was found to be satisfactory at a formal review on January 22, 1980.

Gary Lay was an 11-year-old student in Slavin's fourth-grade class during the 1979-80 school term. Gary had repeated kindergarten and was a year older than the rest of the students in the class. In November 1979, Slavin spoke with Gary's parents during a conference at the school. Slavin complained about Gary's behavior in class and told the parents that Gary had the impression he could do whatever he wanted in the classroom. Gary's

father said that the boy behaved the same way at home.

Mrs. Sue Mary Lay testified before the hearing board that she noticed scratches and black and blue marks on Gary's body in February of 1980. When asked to explain what happened, Gary told his mother, "Mr. Slavin did it to me today, he grabbed and shook me." Slavin testified that Gary often carried on conversations with a girl who occupied the desk in front of his in class. On one occasion, Slavin was seated at his desk and ordered Gary to stop talking. When Gary continued his conversation, Slavin went to Gary's desk and pushed it away from the girl's desk. The front of Gary's desk flew up in the air as Slavin pushed it back. During the hearing, witnesses offered different accounts of the incident. Slavin insisted that he did not abuse Gary, while one student testified that Slavin picked up Gary and threw him into the desk with enough force to cause the front of the desk to fly up. On February 15, 1980, Mrs. Lay met with Slavin and the school principal, Mrs. Gwendolyn Miller. Slavin was not reprimanded for his behavior, but he agreed to send home weekly reports to Gary's parents. After this conference, Gary was asked to stand in the hallway whenever his conversations disturbed the rest of the class.

Tammy Parker was a 10-year-old student in Slavin's class during the 1979-80 school term. Tammy had been living with her mother, her mother's boyfriend, and two other children during January of 1980. Tammy's mother and her boyfriend abused Tammy by beating her with a strap and cutting her head with a tin can. The Illinois Department of Children and Family Services obtained a court order removing Tammy from her mother's custody. Tammy's grandmother, Mrs. Norma Jean Mieno, was granted temporary guardianship.

Mrs. Mieno had several informal conversations with Slavin concerning Tammy's behavior in class. Slavin complained that Tammy often began singing and dancing

in class and that such behavior bothered the other students. On February 22, 1980, Tammy began singing and dancing around her desk while Slavin was conducting class. Slavin told her to stop, but the disruption continued, and she was ordered out into the hall. Finally, Slavin grabbed Tammy by the arm and escorted her into the hallway. Slavin's fingernails were rather long at the time, and he scratched Tammy's arm when he grabbed her. The girl's arm was red and swollen, and she began to cry. Tammy threatened to tell her grandmother and the principal and get Slavin fired. Slavin discussed the incident with Mrs. Miller, the principal, and she told him that if Tammy misbehaved in the future, he should take her by the hand.

On February 26, 1980, Tammy began walking around the class and annoying other students. Tammy testified that she asked Slavin a question and Slavin told her to "Shut up and get out of my way." Slavin denied making this statement. Tammy continued to leave her seat and disrupt the reading lesson that was being conducted. Slavin warned her again, and finally took her by the hand and led her out in the hall. Tammy continued to disrupt the class by rattling the door and darting in and out of the classroom. Slavin warned her that he would call her grandmother if she continued to misbehave. When the disruptions continued, Slavin called Mrs. Mieno, describing Tammy's behavior, and asked her to take Tammy home. Slavin took this action without contacting the school principal, who was absent on the day of the incident.

Rex Rose was another 10-year-old student in Slavin's class. On February 21, 1980, Rex came home from school with three scratch marks near his armpit. Mrs. Marlaina Rose called the principal and accused Slavin of injuring her son. The following day, Mrs. Rose had a conference with Slavin and Mrs. Miller, and Slavin denied

injuring her son. Mrs. Rose indicated that she wanted Rex transferred to another teacher's classroom, but Mrs. Miller suggested a two- or three-week trial period and scheduled another meeting for March 10, 1980.

On March 7, 1980, Slavin took the entire class outdoors to withdraw books from a bookmobile. Slavin observed Rex running along the sidewalk, and he ordered the boy back in line. Rex continued to misbehave by chasing other students and climbing a railing. Rex was ordered to the front of the line so the teacher could keep an eye on him. Slavin testified that Rex continued to disrupt the class after the students returned to the classroom. Rex walked around the room, talked to other students, sat on the floor, and interrupted class for almost 30 minutes. Rex testified that he was seated at his desk and he turned around to pick up a pencil that had rolled off his desk. Rex testified that "Mr. Slavin was at another desk, he came up to me, took me and threw me in my desk. I hit my head on the radiator, and hit my side on the corner of the desk." Rex began crying, and the class started to laugh. Slavin testified that Rex was away from his desk when he placed both hands on the boy's arm and walked him back to his desk. Slavin testified that Rex went "real limp" as they approached his desk, and that he accidently hit his head on the radiator when Slavin put him in his seat. Slavin testified that he called the principal on the intercom but could not reach her. The school secretary, Mrs. Beels, testified that Slavin did not use the school intercom on that day.

Rex put on his boots and coat and left school. Mrs. Rose testified that Rex came home crying, with a bruise on his rib cage and a scratch behind his ear. Mrs. Rose called the principal and arranged for a conference at 4:30 p.m. that day. The conference was held in the principal's office, and it was attended by Mrs. Miller, Mrs. Rose, Rex, Slavin, and James Valesano, the assistant su-

perintendent for instruction in School District No. 131. Slavin was not given a written reprimand or told his conduct was in violation of school rules, but the principal did examine Rex and observed a bump and a scratch behind his ear, as well as a bruise on his rib cage.

Maurice Payne was also a pupil in Slavin's fourth-grade class. Mrs. Miller testified that Mrs. Payne called her on February 29, 1980, at 11 a.m. and told her that Maurice had come home from school. Later that day, a conference was held with Slavin, Mrs. Miller, Maurice, and Mrs. Payne in attendance. Slavin explained that Maurice disturbed the class and refused to return to his desk. Maurice explained that he was playing with a ruler. Maurice told Slavin that he was going home, and Slavin did nothing to stop him and did not notify the principal that the boy was leaving school. Slavin was not reprimanded or told that he had violated school board policy.

On March 19, 1980, the board of education of School District No. 131 dismissed Slavin from his position based on the following charges:

"1. You are guilty of cruelty to students entrusted to your care.

2. You have caused deliberate and irreparable physical, mental and emotional injury to students in your classroom.

3. You have summarily expelled and excluded students from school in violation of School Board Policy and the School Code of Illinois.

4. You are and have been negligent.

5. You have been insubordinate and have failed to follow the instructions of your supervisors and cooperate with (them) and you have further failed to follow the policies of the School Board, and the laws of the State of Illinois regarding the discipline of students.

6. In the opinion of the Board of Education you are not qualified to teach.

7. In the opinion of the Board of Education your dis-

missal is in the best interests of the School.''

Slavin's dismissal was based on alleged violations of regulations promulgated by the board of education, as well as school procedures at the Dieterich school which had been made available to Slavin. These regulations provide, in pertinent part:

"5.06  DISCIPLINE OF PUPILS

D.  Corporal Punishment

1. In cases where all other disciplinary measures have failed the principal or other person duly designated by the superintendent may:

a. Strike the pupil with the open hand in an area below the neck. This action should be taken only after other types of influence have failed to gain the desired goal, and it should not be of sufficient severity to be termed a spanking.

b. Spank the pupil with the open hand or a paddle on an area below the neck after arranging for a reliable witness to be an observer. Such corporal punishment must not exceed reasonable limits and must not be given with malice.''

"Dieterich School Procedures:

* * *

13. POLICIES

* * *

3. Never send a child home without prior approval from the office.''

"MISCELLANEOUS POINTS ON/OR ABOUT DISCIPLINE AND RULES

* * *

3. One disciplinary measure that may cause concern is paddling. I ask that any time a child is to be paddled, I (the principal) do it, this will protect you as a teacher. Also, please be cautious as to how you discipline our students. Never hit, slap, or push our students. If you cannot handle a situation, send for help.''

The sole issue presented in this appeal is whether the defendant's conduct was remediable. If Slavin's conduct was remediable, he was entitled to a written warning be-

fore he could be dismissed pursuant to section 24—12 of the Code (Ill. Rev. Stat. 1979, ch. 122, par. 24—12). The criteria for determining whether a teacher's conduct is remediable are set forth in *Gilliland v. Board of Education* (1977), 67 Ill. 2d 143. In *Gilliland*, this court affirmed the dismissal of a public school teacher for violations of school board regulations that extended over a four-year period. This court established the test for reviewing teacher misconduct by stating:

> "The board's findings are not, of course, immune from judicial review. The court function, however, is limited, and does not permit substitution of the court's judgment for that of the board. Rather, the board's findings must be sustained unless those findings are contrary to the manifest weight of the evidence. [Citations.] The test in determining whether a cause for dismissal is irremediable is whether damage has been done to the students, faculty or school and whether the conduct resulting in that damage could have been corrected had the teacher's superiors warned her." 67 Ill. 2d 143, 153.

An important distinction between the case at bar and *Gilliland* is the time frame of the teacher misconduct. In *Gilliland*, the teacher's transgressions extended over a four-year period, while Slavin never encountered any difficulty with his students during 17 years of teaching until the last 6 weeks of his employment.

The *Gilliland* test mandates a two-pronged analysis of Slavin's alleged misconduct. First, did Slavin's conduct cause damage to the students, faculty or school? Although physical abuse of small children should never be tolerated in our school system, Slavin's conduct did not significantly damage any of his students. None of the students missed school or sought medical attention after contact with Slavin. Slavin was probably guilty of poor judgment in grasping children by the arm when his fingernails could scratch them, but significant damage was not caused by his conduct.

The four cases that plaintiff urges us to follow differ significantly from the case at bar. In *Fender v. School District No. 25* (1976), 37 Ill. App. 3d 736, the court upheld the dismissal of a teacher even though the teacher had not been furnished with a written warning prior to his dismissal. In *Fender* the teacher's abuse occurred over a period of years and was far more serious than Slavin's. Fender held one student by the hair and slapped the child 10 to 13 times until the battering caused bleeding inside the child's mouth. (37 Ill. App. 3d 736, 741.) In *Fender*, the court was presented with a continuing pattern of cruelty rather than isolated incidents in an otherwise unblemished employment record.

In *Rolando v. School Directors of District No. 125* (1976), 44 Ill. App. 3d 658, a sixth-grade teacher procured an electronic cattle prod to discipline unruly students. Recalcitrant students had their names placed on a "coward's list" on the blackboard in front of the classroom. (44 Ill. App. 3d 658, 660.) In *Lowe v. Board of Education* (1979), 76 Ill. App. 3d 348, the teacher beat students with a curtain rod, an extension cord, and a club made out of five pieces of balsa wood nailed together and wrapped with masking tape. *Welch v. Board of Education* (1977), 45 Ill. App. 3d 35, presents a closer factual situation. In *Welch*, a sixth-grade student was paddled for playing a radio during the school lunch hour. When the student indicated that it did not hurt, the teacher paddled him more severely, forcing his mother to take the child to the family physician. (45 Ill. App. 3d 35, 37.) In the case at bar, Slavin did not seriously injure any student and only used physical force to direct a child into the hallway, toward a desk, or into a line. Although Slavin should have exercised more restraint in forcing the students to behave or sit in their desks, we conclude that his conduct did not significantly damage his students. Slavin exercised poor judgment when he allowed students to leave school without contacting the principal,

but this conduct was remediable and should have been called to his attention.

Plaintiff must also demonstrate that the conduct could not have been corrected had the teacher been warned. (*Gilliland v. Board of Education* (1977), 67 Ill. 2d 143, 153.) Slavin was dismissed without a formal, written warning concerning the nature of his conduct, although he was instructed by the school principal to avoid grasping children by the arm. Plaintiff maintains that the school board would have to retrain Slavin and provide constant supervision before he could be placed in the classroom again. This conclusion is based on the expert testimony of Georgia Scriven before the hearing board. Scriven, a professor in the Department of Education at Northern Illinois University, testified that Slavin would probably continue to have discipline problems if he is allowed to return to the classroom. Scriven did admit that there was a possibility that Slavin would be a useful teacher in the future, and her answer to a hypothetical question before the hearing officer is not sufficient reason for this court to reverse the holding of the appellate court.

Finally, plaintiff argues that the students should have been provided with a hearing before they were sent home from school, and that the students were denied due process of law as enunciated by the United States Supreme Court in *Goss v. Lopez* (1975), 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729. Even if plaintiff's contention here were factually true, *Goss* does not apply here. In *Goss*, the court invalidated an Ohio statute that permitted 10 days' suspension from school without a notice or a hearing. However, the *Goss* court did not discuss the constitutional implications of sending children home from school for the rest of the school day after they had repeatedly disturbed the class. *Goss* does not support plaintiff's theory for reversal, and we can find no due process violations based on the actions of Slavin.

122

We therefore conclude that Slavin's conduct was remediable, and that the plaintiff erred in dismissing him. We affirm the decision of the appellate court and order Slavin reinstated with back pay.

*Judgment affirmed,*
*as modified.*