2021 IL App (1st) 200727-U

FIFTH DIVISION
JUNE 11, 2021

No. 1-20-0727

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| DARRYL BROWN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | On Petition for Review of a Final |
| v. | ) | Administrative Order of the |
| | ) | Board of Education of the City |
| BOARD OF EDUCATION OF THE CITY OF | ) | of Chicago |
| CHICAGO, ILLINOIS STATE BOARD OF | ) | |
| EDUCATION, JANICE K. JACKSON, and BRIAN | ) | |
| CLAUSS, | ) | |
| | ) | |
| Respondents. | ) | |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Petitioner's dismissal as a tenured teacher affirmed over his challenges to the admission of evidence during the dismissal hearing and the factual findings of the Board of Education of the City of Chicago.

¶ 2    Darryl Brown was a tenured teacher at William Rainey Harper High School (Harper) in Chicago.  On June 14, 2018, the Board of Education of the City of Chicago (the Board) charged Mr. Brown with misconduct that constituted cause for dismissal based on incidents that occurred

both in and out of the classroom between November 2017 and January 2018. Following a hearing in December 2018 and February 2019, a hearing officer determined that the Board proved the charges against Mr. Brown, and that Mr. Brown's conduct was irremediable *per se*, justifying termination. On April 22, 2020, the Board adopted the factual findings in the hearing officer's report and issued its own opinion and order with additional reasons justifying the dismissal of Mr. Brown.

¶ 3 On appeal, Mr. Brown argues that the Board relied on inadmissible evidence in making its findings and that his conduct was not irremediable *per se* and did not cause harm to his students. For the reasons that follow, we affirm the decision of the Board.

¶ 4 BACKGROUND

¶ 5 Mr. Brown began his career at Chicago Public Schools in 1996. In 2008, he started teaching at Harper, a high school in the West Englewood neighborhood of Chicago. There were 85 students and 15 teachers at Harper during the 2017-2018 school year.[1] Twenty-six percent of the students were in special education. Mr. Brown primarily taught various math classes, but occasionally co-taught other subjects.

¶ 6 Beginning in 2016, prior to the events of 2017-2018 that prompted the Board to seek dismissal of Mr. Brown, he had received numerous warnings about his conduct in the form of Performance Improvement Process (PIP) documents. In March 2016, Mr. Brown hit the hand of a student who was throwing books in a history class. Following this incident, Mr. Brown was instructed to refrain from hitting or touching students and instead follow best practices for

---

[1] Harper is slated to close at the end of this school year, which is the reason for its low enrollment in recent years.

redirecting students. For his part, Mr. Brown denied hitting the student, and stated that he tapped her on the shoulder and instructed her to come with him, but she turned and hit him.[2]

¶ 7    Mr. Brown next received a PIP based on an occurrence in February 2017. In that incident, the principal at Harper, Leonetta Sanders, saw Mr. Brown's students hiding from him in the library. When she spoke to Mr. Brown, he said that he had removed the students from the classroom for being disruptive and was taking them to the library for the remainder of the class period. Principal Sanders instructed Mr. Brown to improve his classroom management.

¶ 8    In his explanation of the incident, Mr. Brown stated that he was escorting a number of children out of a co-taught class because of their disruptive behavior. He instructed the students where to go, but two students did not follow his instructions and went to the library. Mr. Brown explained that he let those two students go rather than follow them and abandon the other students who he was also escorting.

¶ 9    Mr. Brown also received PIPs for excessive tardiness, failing to complete a training, and clocking in at another school after asking for a day off.

¶ 10    There were five incidents occurring between November 2017 and January 2018 that precipitated the Board's decision to seek Mr. Brown's dismissal in June 2018. Testimony was elicited regarding each incident.

¶ 11                                    A. November 27, 2017 Incident

¶ 12    Before Mr. Brown's third period math class began on November 27, Mr. Brown observed a student, J.P., using an iPad. J.P. testified that Mr. Brown "snatched" the iPad from him because

---

[2] A PIP was created recounting this incident, but because it was not timely served on Mr. Brown, he was not officially disciplined for this conduct.

Mr. Brown believed that J.P. was looking at inappropriate material. J.P. asked Mr. Brown why he took the iPad away. J.P. denied using it for inappropriate purposes. According to J.P., Mr. Brown then bumped against J.P. with his chest in an aggressive manner, more than once, pushing J.P. back a few steps. J.P. attempted to block the chest bump with his arm. J.P. testified that another student, R.H., then pushed J.P. and Mr. Brown apart, causing Mr. Brown to stumble backwards. R.H. left the classroom, with Mr. Brown following. J.P. said he believed that Mr. Brown behaved inappropriately, because adults should not push children. J.P. was not injured, and he testified that he was not afraid of Mr. Brown.

¶ 13    R.H. testified consistently with J.P. that he saw J.P. and Mr. Brown having an "altercation," which prompted R.H. to insert himself between them and push them apart. R.H. testified that he had his hands on J.P.'s chest and Mr. Brown's stomach. After R.H. separated the two, Mr. Brown chest bumped R.H., backing him into a table.

¶ 14    R.H. used his left arm to lightly push Mr. Brown away, and then left the classroom with his hands up. Mr. Brown followed R.H. into the hallway, where they met school security officer Charles Sales. According to Mr. Sales, he heard a commotion in Mr. Brown's classroom and saw R.H. leave the room with his hands up, with Mr. Brown following. Mr. Brown told Mr. Sales that R.H. pushed him, but R.H. denied doing so. Mr. Sales and R.H. both testified that as R.H. turned to re-enter the classroom, Mr. Brown pulled on his backpack to prevent him from leaving the hallway.

¶ 15    Mr. Brown also testified to the events of November 27. He stated that six male students were looking at a video on an iPad, and he asked J.P. what they were looking at. He lifted the iPad up and handed it back to J.P. after determining that it was not inappropriate material. J.P. told Mr.

Brown that he "didn't have to do that," and was "coping [sic] an attitude" as he approached Mr. Brown with his chest out. Mr. Brown admitted that he then initiated physical contact with J.P. and bumped his chest into J.P. Mr. Brown testified that R.H. intervened, tackled him and tossed him onto a desk. R.H. then left the room and Mr. Brown followed him. A security officer intercepted R.H., and Mr. Brown told the officer that R.H. had tackled him. Mr. Brown testified that he sustained injury due to the tackle and at one point believed his thigh bone might have been broken, but he never sought medical treatment.

¶ 16    Harper assigned Cheryl Smith, an investigator with Fact Finders Group, to investigate the November 27 incident. Ms. Smith testified that she was assigned to the case on November 28, 2017, and her responsibility was to determine whether the events occurred as described. After interviewing the relevant parties, including Mr. Brown, J.P., and R.H., she determined that there was no credible evidence that Mr. Brown chest bumped R.H., but that there was evidence that Mr. Brown pushed and grabbed him to stop him from re-entering the classroom. She also determined that the evidence supported J.P.'s allegation that Mr. Brown "pushed" him.

¶ 17                                B. December 18, 2017 Incidents

¶ 18    The next two incidents precipitating the Board's decision to discharge Mr. Brown occurred on December 18, 2017. N.D., then a sophomore at Harper, entered Mr. Brown's class after her lunch period. As class started, N.D. was eating a pickle leftover from her lunch. Mr. Brown told her "throw that fucking pickle away." N.D. told him that he could not talk to her that way, and Mr. Brown told her that she could leave the class. The other students seemed surprised at Mr. Brown's use of profanity. N.D. left the classroom and went to a school administrator's office to complain.

¶ 19    Later in that same period, student F.L. asked Mr. Brown to slow down as he explained a concept because some people were having trouble understanding.  Mr. Brown said "get your slow ass up and you teach it."  F.L. told Mr. Brown not to talk to her like that and also left the room to inform an administrator.

¶ 20    According to Mr. Brown, he did not swear at N.D., but did instruct her to put the food away under threat of reporting her to the dean.  Mr. Brown testified that N.D. responded by swearing at him and refusing his request.  Mr. Brown stated that N.D. constantly swore.  With regard to F.L., Mr. Brown testified that he asked her to come to the chalkboard, and she was doing something else, so he asked why she was being so slow in carrying out his request.

¶ 21                                    C. January 18, 2018 Incident

¶ 22    The final incident that prompted the dismissal charges occurred on January 18, 2018.  On that day, the teachers at Harper were required to attend a professional development course offsite.  The assistant principal, Papedia Evans, sent an email explaining the substitute coverage the teachers would receive when they attended the course.  Mr. Brown was told that he would have coverage for his third and sixth period classes, but he would have to attend his second and seventh period classes.  This would require Mr. Brown to eat lunch during third period, very early in the day.

¶ 23    As Ms. Evans was leaving a classroom, Mr. Brown began yelling at her from several feet away.  He told her she was "incompetent" and "stupid" for screwing up the schedule.  As they walked towards each other, Ms. Evans asked Mr. Brown to stop screaming.   When Mr. Brown was a little over one foot away from her, he became aggressive, pointing and gesturing towards her.  Ms. Evans asked if Mr. Brown was going to hit her and Mr. Brown walked into his classroom

and slammed the door. Ms. Evans went to the principal's office, where she expressed that she was upset, fearful, and embarrassed by Mr. Brown's behavior.

¶ 24    Mr. Brown explained that when he approached Ms. Evans he was enraged and loud due to his unhappiness with his schedule. He admitted to pointing his finger at Ms. Evans; however, he denied that he was threatening. He further testified that he referred to the *schedule* as stupid, and not Ms. Evans.

¶ 25                    D. Testimony of Principal Sanders

¶ 26    Principal Sanders testified regarding the events precipitating Mr. Brown's dismissal. With regard to the November 27 incident, she testified that she heard about it from a dean at Harper. Mr. Brown objected to Principal Sanders testifying about what the dean told her, but his objection was overruled on the grounds that the Principal's testimony would not be admitted for its truth. Principal Sanders' testimony echoed the testimony of the witnesses to the incident. She testified that she interviewed R.H., J.P., and other students in the classroom, as well as Mr. Brown. In addition, she testified that she viewed a videotape of the hallway after R.H. exited the classroom. Mr. Brown objected to Principal Sanders' testimony regarding what the video depicted on hearsay grounds given that the video was no longer available. Principal Sanders was allowed to testify to the video contents over Mr. Brown's objection and explained that the video showed R.H. leaving the classroom and Mr. Brown talking, although the video did not include sound.

¶ 27    Principal Sanders also testified as to what she was told about the December 18 incident, and Mr. Brown's hearsay objection was again overruled. The hearing officer explained that Principal Sanders' testimony would not be admitted for its truth, but only to explain her resulting investigation. Principal Sanders testified that Mr. Brown should have reviewed the class rules

with N.D. and asked her to put the pickle away, and, if she refused, have security come and remove it.  As for F.L., Principal Sanders testified that Mr. Brown "by no means" should have used the word "slow" to refer to F.L. without an "explicit explanation."

¶ 28    Finally, Principal Sanders testified to the events of January 18, 2018.  She spoke to Ms. Evans about what occurred, but Mr. Brown refused to talk to her.  Therefore, she reviewed video footage of the hallway where the confrontation occurred.  Principal Sanders testified that the video depicted Mr. Brown and Ms. Evans walking towards each other in the hallway. As they neared each other, Mr. Brown pointed his finger at Ms. Sanders. Mr. Brown's objection to Principal Sanders' testimony of what she saw on the videotape was overruled.

¶ 29                                E. Testimony of Roy Zook

¶ 30    Roy Zook, a former teacher at Harper, testified on behalf of Mr. Brown.  Mr. Zook testified that he co-taught with Mr. Brown on several occasions, but not during the 2017-2018 school year. He never saw Mr. Brown curse or push students, but described him as a good, encouraging teacher. Mr. Zook admitted that it was inappropriate for a teacher to push, chest bump, or swear at a student.

¶ 31                                F. Findings

¶ 32    Following the conclusion of testimony, the hearing officer found that Mr. Brown committed misconduct where he escalated a conflict with J.P., made demeaning statements to students N.D. and F.L, and directed demeaning, threatening, and intimidating public conduct against Ms. Evans.  Significantly, the hearing officer did not find Mr. Brown committed misconduct towards R.H.  The hearing officer found that Mr. Brown's conduct was *per se* irremediable as it was negligent and immoral, and concluded that the Board had cause to dismiss Mr. Brown.

¶ 33    The Board filed a limited objection to the hearing officer's report, arguing that Mr. Brown's conduct also caused psychological harm to the students and supported dismissal under additional legal theories.  Mr. Brown did not object to the hearing officer's report.

¶ 34    On April 22, 2020, the Board adopted the factual findings and conclusions contained in the hearing officer's report, but also issued its own opinion.  There, it found that in addition to being *per se* irremediable because it was negligent and immoral, Mr. Brown's conduct was also irremediable because it caused psychological harm to his students.  Further, the Board found that Mr. Brown's conduct was also irremediable under the test outlined in *Gilliland v Board of Education*, 67 Ill. 2d 143 (1977), because it caused harm to the students and could not be cured by a warning. The Board passed a formal resolution terminating Mr. Brown's employment.  This appeal follows.

¶ 35                                              ANALYSIS

¶ 36    We note that we have jurisdiction to review this matter, as Mr. Brown filed a timely notice of appeal in this court following the Board's final order. See 105 ILCS 5/34-85(a)(8) (West 2018) (providing for judicial review of teacher dismissals under the Administrative Review Law by petition filed in the appellate court); see also Ill. S. Ct. R. 335(a) (eff. July 1, 2017).

¶ 37    Mr. Brown raises numerous issues on appeal, but they fall into two general categories: challenges to the admission of evidence, and challenges to the Board's factual findings.  We turn first to Mr. Brown's challenges to the admission of evidence.  At the outset, we note that because a dismissal hearing is neither a judicial nor quasi-judicial proceeding, common rules of evidence do not necessarily apply.  *M.F. Booker v. Board of Education of the City of Chicago*, 2016 IL App (1st) 151151, ¶ 69.  Rather, the overarching concern is whether the defendant received a fair

hearing, which amounts to an opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in rulings upon evidence. *Id.* We review the admission of evidence in administrative proceedings for an abuse of discretion. *Ellison v. Illinois Racing Board*, 377 Ill. App. 3d 433, 443 (2007).

¶ 38    Mr. Brown initially challenges the admission of Principal Sanders and Ms. Smith's testimony on hearsay grounds.  To be sure, "procedural due process protections preclude the admission of hearsay evidence in an administrative proceeding." *Chamberlain v. Civil Service Comm'n*, 2014 IL App (2d) 121251, ¶ 47.  But where there is competent evidence supporting the administrative decision, the improper admission of hearsay testimony is not prejudicial error. *Booker*, 2016 IL App (1st) 151151, ¶ 70. Mr. Brown argues that it was error to admit Principal Sanders' testimony regarding what she was told about the events of November 27, December 18, and January 18, as she did not have personal knowledge about those events. However, Principal Sanders' testimony regarding what she was told about the events was not admitted for its truth, but instead was for the purpose of explaining her course of action, which included taking statements from the individuals involved in the incidents as well as Mr. Brown.  Further, Principal Sanders' testimony about the incidents was echoed by firsthand testimony of the student witnesses and others which cannot be categorized as hearsay.  The same is true for Ms. Smith's testimony regarding what she was told during her investigation into the events of November 27.  Therefore, because competent evidence supported the hearing officer's decision, Mr. Brown was not prejudiced by the admission of Principal Sanders and Ms. Smith's allegedly hearsay testimony.

¶ 39    Mr. Brown also raises several challenges to the admission of evidence surrounding the videotape of the November 27 and January 18 incidents.  Specifically, he argues that it was error

to allow Principal Sanders to testify as to what the video recordings depicted because the Principal was not an eyewitness to either event. Generally, a witness may not testify to the events depicted on a videotape unless that witness personally observed the event recorded. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 41. However, in order to find the admission of this testimony reversible error, Mr. Brown must show that he was prejudiced. See *Matos v. Cook County Sheriff's Merit Board*, 401 Ill. App. 3d 536, 541 (2010) (administrative officer's decision to admit evidence subject to reversal only if there is "demonstrable prejudice" to the complaining party).

¶ 40    With regard to the November 27 videotape, it depicted the confrontation between R.H., Mr. Brown, and Mr. Sales in the hallway outside Mr. Brown's classroom. But the hearing officer did not find that Mr. Brown acted inappropriately towards R.H. based on that videotape. As such, the introduction of testimony regarding the November 27 videotape did not prejudice Mr. Brown. And with regard to the January 18 videotape, the evidence as to what was depicted there was cumulative to other properly admitted evidence. Ms. Evans—and Mr. Brown himself—testified that Mr. Brown pointed a finger at Ms. Evans, exactly what Principal Sanders stated the videotape depicted. Thus, Mr. Brown has failed to establish prejudice by the admission of evidence regarding either videotape.

¶ 41    To the extent that Mr. Brown also challenges the Board's failure to preserve the two videotapes, he failed to elicit testimony on this issue at trial. Therefore, he has forfeited review of this issue on appeal. See *Keeling v. Board of Trustees of Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45 (party forfeits argument it failed to raise before the administrative agency).

¶ 42    Finally, Mr. Brown contends that it was error to admit the PIP of March 2016 (describing Mr. Brown's interaction with a student throwing books), because he was never served with notice of the PIP. But the hearing officer expressly stated that the PIP would "not be admitted for anything related to discipline" but only as documentary evidence of Principal Sanders' conversation with Mr. Brown in which she told him to refrain from hitting or touching students. The officer then asked counsel for Mr. Brown if that "alleviated his concerns" as to the PIP and counsel responded affirmatively. Having acquiesced to the introduction of the March 2016 PIP for that limited purpose, Mr. Brown cannot now challenge its admission on appeal. See *People v. Caffey*, 205 Ill. 2d 52, 114 (2001) (when a party invites the admission of evidence, he cannot challenge the admission of that evidence on appeal).[3]

¶ 43    We turn next to Mr. Brown's challenge to the Board's factual findings that formed the basis of its decision to remove him. The Illinois School Code prohibits the removal of a teacher who has completed the probationary period except for cause. 105 ILCS 5/34-85(a) (West 2018). Nobody disputes that Mr. Brown's conduct was cause for dismissal, but conduct constituting cause may be remediable or irremediable. If the conduct is remediable, a written warning is required before termination can proceed; however "[n]o written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed to be

---

[3] Mr. Brown also asserts that the Board erroneously relied on undisclosed opinion testimony in order to find that the students suffered psychological harm from his conduct. Setting aside the fact that there is no support in the record for this assertion, we need not address this claim of error for the reasons discussed *infra* ¶ 53.

irremediable." *Id.* It is undisputed that Mr. Brown did not receive a written warning before the charges were issued.

¶ 44     Prior to the amendment of the School Code, in order to determine whether conduct was irremediable, the Board was required to consider (1) whether the conduct caused significant damage to students, faculty, or the school; and (2) whether the teacher would not have corrected her conduct even if she had been issued a written warning. *Gilliland v. Board of Education of Pleasant View Consolidated School District No.* 622, 67 Ill. 2d 143, 153 (1977).  The amendment of the School Code provided that certain conduct (that which is cruel, immoral, negligent, or criminal) was irremediable *per se* and no proof of damage from such conduct was necessary to support termination. *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 531 (2003).

¶ 45     The crux of Mr. Brown's argument is that the Board erred in finding his conduct irremediable.  The parties dispute the standard of review applicable to this issue: Mr. Brown contends that the Board's decision is subject to a clearly erroneous standard of review, while the Board argues that we should apply a manifest weight of the evidence standard.

¶ 46     On appeal of an administrative agency's decision, the standard of review depends on whether the issue on review presents a question of law, a question of fact, or a mixed question of law and fact. *Doe Three v. Department of Public Health*, 2017 IL App (1st) 162458, ¶ 25.  An agency decision on a question of law is reviewed *de novo*. *James v. Board of Education of the City of Chicago*, 2015 IL App (1st) 141481, ¶ 12.  On the other hand, an agency's conclusions on questions of fact are considered *prima facie* true and correct. *Rios v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191399, ¶ 29. To that end, we will overturn an agency's factual findings

if they are against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Village of Buffalo Grove v. Board of Trustees of Buffalo Grove Firefighters' Pension Fund*, 2020 IL App (2d) 190171, ¶ 38. Finally, a mixed question of law and fact asks the legal effect of a given set of fact and is subject to review under a clearly erroneous standard. *Livingston v. Department of Employment Security*, 375 Ill. App. 3d 710, 715 (2007).

¶ 47     We review the decision of the Board, and not the hearing officer. See *Mohorn-Mintah v. Board of Education of the City of Chicago,* 2019 IL App (1st) 182011, ¶ 14. Here, the Board adopted the hearing officer's finding that Mr. Brown's conduct was irremediable *per se* because it was immoral and negligent but, the Board also found that the conduct caused psychological harm and that it was actually irremediable under the *Gilliland* test. This is a question of fact that we review under the manifest weight of the evidence standard. See *Younge*, 338 Ill. App. 3d at 531; see also *Prato v. Vallas*, 331 Ill. App. 3d 852, 864 (2002) (whether conduct is irremediable is a question of fact, not law).

¶ 48     The dispositive issue on appeal is whether Mr. Brown's conduct was immoral. While the Code does not define immoral conduct, the generally accepted meaning is " 'shameless' " conduct that displays " 'moral indifference to the opinions of the good and respectable members of the community.' " *Ahmed v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 165 (2006) (quoting Black's Law Dictionary 751 (6th ed. 1990)). Here, the record supports the Board's conclusion that Mr. Brown's conduct was immoral. By Mr. Brown's own admission, he initiated aggressive physical contact with a teenage student in order to assert his dominance. In doing so, he demonstrated that he was indifferent to the moral standards of the community, given that he

had previously been admonished not to engage physically with students. He exhibited similar threatening conduct when he confronted Ms. Evans about his unhappiness with the schedule on January 18. While he challenges the Board's acceptance of Ms. Evans' version of events, he corroborated her account in large part, admitting that he was "enraged," "loud" and pointed his finger at her. This, too, reflected an indifference to the standards of the community, which expected teachers to project a professional image and to treat everyone in the school community with respect.

¶ 49    The evidence that he swore at N.D. for eating a pickle in class and his remark that F.L. was mentally slow, was accepted by the trier of fact over Mr. Brown's explanation. We see no reason to reject that credibility finding in favor of Mr. Brown's version. Thus, Mr. Brown's conduct was contrary to the standards of "good" and "reasonable" people especially given his position as a teacher. Indeed, both N.D. and F.L. testified that the other students in the classroom appeared shocked and surprised by Mr. Brown's comments. Mr. Brown's pattern of threatening physical conduct, combined with the use of degrading and disrespectful language towards students, all support the Board's finding that Mr. Brown's conduct was irremediable *per se* due to being immoral. See *Booker*, 2016 IL App (1st) 151151, ¶ 82 (conduct that may be remediable standing alone may become irremediable when combined with other conduct).

¶ 50    To support his contention that his conduct was remediable, Mr. Brown cites *Swayne v. Board of Education of Rock Island School District No.* 41, 144 Ill. App. 3d 217 (1986) and *Board of Education of School District No. 131 v. State Board of Education*, 99 Ill. 2d 111 (1983). In *Swayne*, the teacher hit a disruptive six-year-old student with a yardstick twice in one day, (once with the student's pants down), and left him in a closet in the classroom for several hours. *Id.* at

218. The Board discharged the teacher finding the conduct irremediable, but the trial court reversed, and this court affirmed the trial court. *Id.* at 217.

¶ 51    In *Board of Education*, the teacher roughly handled several misbehaving students, causing them to suffer scratches and bruises. *Id.* at 113-16. On more than one occasion, students alleged that he threw them into their desks. *Id.* at 114, 116. One student suffered a bruise on his ribcage. *Id.* at 117. The supreme court found the conduct was not irremediable because none of the students were "significantly damage[d]." *Id.* at 119.

¶ 52    The conduct of the teachers in *Swayne* and *Board of Education* was arguably more egregious than Mr. Brown's conduct here. But both *Swayne* and *Board of Education* applied the *Gilliland* test, requiring a finding of significant damage to students. Here, we do not consider whether Mr. Brown's conduct satisfies the *Gilliland* test where it was irremediable *per se* under the School Code. Moreover, the norms of appropriate conduct in education are constantly evolving. For example, corporal punishment was tolerated in Illinois public schools until 1993. See 105 ILCS 5/24-24 (1992). If *Swayne* and *Board of Education* were decided today, it is not unlikely that the outcome would have been different. In other words, it is unreasonable to compare Mr. Brown's conduct to the conduct of teachers over 40 years ago in the context of remediability and what is considered acceptable conduct for a teacher.

¶ 53    We conclude that the Board's finding that Mr. Brown's conduct was irremediable *per se* because it was immoral was not against the manifest weight of the evidence. Accordingly, we need not review the Board's other bases for termination, including its finding that the students were psychologically harmed by Mr. Brown's conduct.

¶ 54                              CONCLUSION

¶ 55     For the foregoing reasons, we affirm the judgment of the Board.

¶ 56     Affirmed.