NANCY SWAYNE, Plaintiff-Appellee, v. THE BOARD OF EDUCATION OF ROCK ISLAND SCHOOL DISTRICT No. 41, Defendant-Appellant (The State Board of Education *et al.*, Defendants).

Third District  No. 3—85—0752

Opinion filed June 19, 1986.

Andrea R. Waintroob, James C. Franczek, Jr., and Charles P. Rose, all of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellant.

Robert Deffenbaugh, of Drach & Deffenbaugh, P.C., of Springfield, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

Plaintiff, Nancy Swayne, was a teacher for 16 years in the elementary schools of Rock Island. She was discharged by defendant board of education on October 4, 1983. Pursuant to section 24—12 of the School Code, a hearing was held to determine whether irremediable cause existed for the discharge. The hearing officer concluded that cause was present. On administrative review, the circuit court reversed. We affirm the circuit court.

The incident which prompted plaintiff's discharge occurred on September 28, 1983. Plaintiff was teaching first grade at the Hawthorne-Irving School. She had a class load of 32, which is considered a very large group. Among the group were several repeaters and some children who were eventually referred for special education. Also in the class was Terry Pulliam. Terry was, to put it mildly, a disciplinary problem. His kindergarten teacher, Marilyn Miskowicz, testified at some length concerning her problems with Terry. Terry liked to fall out of his chair, talk out of turn, push, kick, and trip other children and generally make a nuisance of himself. Miskowicz also related that there was little that one could do to curb Terry's activities short of keeping him at one's side and away from the other children. Miskowicz also testified to having spanked Terry on occasion. The testimony generally reveals that Terry had not improved his deportment between kindergarten and first grade.

At about 12:15 p.m. on the day in question, plaintiff observed a student "sailing toward the blackboard." A gleeful smile on Terry's face indicated that he was the instigator. He also knocked over a tape recorder. Plaintiff took Terry and put him in a multi-doored coat closet behind the last row of desks. Although the parties differ in their characterization of Terry's impromptu dungeon, it appeared to be over 6-feet high with shelves beginning at a height of about 42 inches. The closet was slightly deeper than 24 inches. There is about a 5-inch space between the bottom of the door and the floor, which lets in light from the room and would be high enough for a person on the floor to look in or out of the closet. There is no independent lighting in the closet.

At 12:30, plaintiff took the remainder of the class to the library. Upon her return a minute or two later, plaintiff found the door open and Terry asleep on a coat and partly out of the closet. Plaintiff allowed Terry to sleep until 1:40 when the children returned. Terry was then put back in the closet and the door closed. Shortly thereafter, Terry became disruptive. He started swinging the closet doors, calling the names of other students aloud and otherwise disturbing the class. Terry persisted despite being warned. Plaintiff then took Terry out and swatted him three times with a yardstick. Terry was then redeposited in the closet. Soon, Terry was up to his old tricks of disturbing the class. Plaintiff then took Terry out of the closet and marched him to the front of the class. He was ordered to lower his blue jeans and to bend over and grab his ankles. Whatever underwear Terry had on remained. Plaintiff gave him three swats with the yardstick and, after ordering him to pull up his pants, returned him to the closet,

where he remained until the other children were ready to leave. After holding Terry for a few minutes after school, plaintiff allowed him to go home.

Terry's mother, Mrs. Ann Pulliam, testified that she went to meet her children at the close of school. Some children informed her that "Terry was 'dogged' today." She spotted Terry at the school "looking like he was lost." Terry denied being spanked or put in the closet when his mother asked him about it.

Mrs. Pulliam went looking for plaintiff. The two had previously conversed about Terry's problems. Plaintiff spotted Mrs. Pulliam and said "You're the one I want to see." With Terry present, a heated discussion ensued. Plaintiff told Mrs. Pulliam that she was sick and tired of Terry. When Mrs. Pulliam asked about the pants-down spanking and closet time, plaintiff said she had done it. Mrs. Pulliam said, "Bitch, I don't do that."

The conversation eventually dissolved into an argument about the propriety of and necessity for such drastic measures. Mrs. Pulliam thought that it was not plaintiff's place to spank her child, while plaintiff countered that if his mother wouldn't discipline him, she would. The argument concluded when principal Jim Davis promised Mrs. Pulliam that the incident would be investigated.

That evening, Davis met with district personnel director Robert Lagerblade and superintendent James Hopson. They decided to suspend plaintiff with pay pending investigation.

The next morning, plaintiff met with Davis. Davis, after confirming the relevant details, told plaintiff that he considered her conduct inappropriate. Plaintiff's response was that her conduct was appropriate. She further stated that this was how it was done in the old days and that she thought she could moderate Terry's behavior using those means. After Davis reiterated his disapproval, plaintiff stated that although she would have done it again, she would not do it anymore since Davis disapproved. Later that morning, in response to Lagerblade's handing her a letter of suspension, plaintiff stated that the district was overreacting.

Davis interviewed Mrs. Pulliam as part of his investigation. She told him that Terry was a different child following the incident. He no longer wanted to be around other children. He did not want to go to school. He only wanted to sleep in her bed with her because he had bad dreams.

On October 3, Hopson and Lagerblade met with plaintiff and a union representative. Plaintiff was asked if she was familiar with the district's policy concerning the presence of witnesses during corporal

punishment. She replied that she thought other students could be witnesses. When asked whether she knew that only the principal could administer corporal punishment, she replied that she assumed that he had the prerogative. (There was, however, considerable testimony that other teachers administered corporal punishment as the need arose.) She also stated that although parents had the right to exempt their children from corporal punishment, she was not aware that Mrs. Pulliam had sent such a letter (she had not). Her attitude toward the propriety of her conduct was as always; although she would not paddle children in the future, she felt that she needed to take drastic measures since all previous efforts had failed.

The decision to discharge was made on a unanimous vote by the board. The board accepted the characterization of Davis and Hopson that plaintiff's failure to recognize the gravity of her conduct rendered the cause for her discharge irremediable.

The hearing also featured the testimony of two psychiatrists. The board used Dr. Ner Littner, a prominent Chicago child psychiatrist. His testimony was based on a hypothetical question constructed from the facts of the incident. He did not examine any party or witness. His conclusions were that plaintiff had acted very inappropriately, could seriously harm a child of Terry's make-up, and could cause variable harm to those children who observed the incident. He further opined that plaintiff was probably not the kind of person who should be teaching young children.

Dr. Thomas T. Tourlantes testified for plaintiff. He had been hired to examine plaintiff before the second day of hearing to rebut Dr. Littner. Dr. Tourlantes drew few strong conclusions. He did state that although plaintiff had a strong personality and might not change, she could certainly refrain from striking students if so instructed.

The record contains miscellaneous testimony relevant to the issues of damage caused and remediability. It appears that in spite of the psychological changes testified to by his mother, Terry, now in second grade, behaves as badly as ever in school.

Another issue relevant to remediability is plaintiff's record. Her evaluations from principal Davis were excellent. There had been comments concerning plaintiff's temper, but she had never graded out at less than satisfactory. On the other hand, Davis testified to five or six incidents within a year of the Pulliam spanking where parents had complained of plaintiff's rough treatment of their children. However, none of these complaints was substantiated or even seriously pursued. Thus, they constitute pure hearsay and should not have been considered by the hearing officer.

Finally, some interesting backdrop scenery and character setting which may or may not be legally relevant add a certain measure of understanding to the dynamics of this scenario. Plaintiff teacher is white. Terry is black. Principal Davis is also the mayor of Rock Island. Plaintiff teacher is an active and vocal union leader. There was considerable media coverage of the incident.

The trial court disagreed with the hearing officer that plaintiff's conduct was irremediable. We agree with the trial court.

To begin, it is true that plaintiff's conduct could constitute cause for discharge. Our concern here, however, is with the finding of irremediability.

■ The test for whether cause for discharge is irremediable is "whether damage has been done to the students, faculty or school, and whether the conduct resulting in the damage could have been corrected had the teacher's superiors warned her." *Gilliland v. Board of Education* (1977), 67 Ill. 2d 143, 153, 365 N.E.2d 322.

At the outset, we are confronted by the board's argument that where the conduct charged is excessive corporal punishment, and damage is shown, then there is no issue as to remediability since the damage cannot be undone. (*Welch v. Board of Education* (1977), 45 Ill. App. 3d 35, 358 N.E.2d 1364.) At best, this is a questionable statement of the law, since it effectively eliminates the second prong of the *Gilliland* test regarding the opportunity to correct or possibly prevent. Beyond that, however, it appears from the record that the damage to the children, faculty and school was slight at best and perhaps nonexistent. Terry was not physically harmed. As to psychological harm to Terry or the students who witnessed the event, the evidence is very thin and highly speculative. The only evidence of damage to the latter comes from Dr. Littner, who testified that variable harm to the observers might result. Dr. Tourlantes testified that it was unlikely that "global trauma" would result. Concerning Terry, there was no expert testimony on damage to him. His mother's testimony centered more on the short-term harm caused by the humiliation which her son suffered. In short, it does not appear that the kind of harm caused by plaintiff was such that we should not inquire into remediability.

When dealing with a necessarily vague standard such as the *Gilliland* tests, a court of review is inevitably drawn to comparisons with prior cases in order to place the facts before it on some sort of continuum of severity. Following such a recapitulation, we conclude that the cases where discharge for excessive corporal punishment has been upheld involve much worse misconduct than is present here. In *Fender*

*v. School District No. 25* (1976), 37 Ill. App. 3d 736, 347 N.E.2d 270, the teacher was discharged based on four separate instances of striking students on or about the face. Two of these strikings were clearly unprovoked. In *Rolando v. School Directors* (1976), 44 Ill. App. 3d 658, 358 N.E.2d 945, the teacher used an electric cattle prod to tame his unruly sixth graders. Those who expressed distaste for the prod had the option of having their names placed on a "Cowards List" on the chalkboard. In *Welch v. Board of Education* (1977), 45 Ill. App. 3d 35, 358 N.E.2d 364, the teacher had administered a paddling to a student. When the student confided to his younger brother that it had only stung, the teacher responded, "Somers is a big man. We'll make it hurt." He then spanked Somers' buttocks beet-red. Finally, in *Lowe v. Board of Education* (1979), 76 Ill. App. 3d 348, 395 N.E.2d 59, the teacher in question hit her students with a curtain rod and generally ran a madhouse of a classroom.

■ Of the cases cited, only *Welch* is mildly comparable to the instant case, since it involves a single incident as opposed to a pattern of conduct. The difference between the cases hinges on the distinction between motive and intent, a distinction which escapes the board. The board's brief continually refers to plaintiff as a sadist, bent on brutalizing her students. Unlike *Welch*, however, where the teacher's motive was clearly to inflict pain for pain's sake, plaintiff here inflicted psychological and physical pain with nothing but the best motives. In *Welch*, there was no showing that the physical punishment was arguably necessary to accomplish a legitimate educational goal. Here, plaintiff believed, whether or not unreasonably, that it was necessary to go a step beyond the unsuccessful methods of progressive discipline already attempted. In light of the uncontradicted evidence of Terry's incorrigibility, we cannot equate plaintiff's misconduct with that described in the reported cases.

We are fortunate to have a recent supreme court case to consider on this issue. In *Board of Education v. State Board of Education* (1983), 99 Ill. 2d 111, 457 N.E.2d 435 (the "Slavin case"), plaintiff was discharged for being too rough in his handling of fourth graders. One student was grabbed and shaken, leaving black and blue marks. The same student was supposedly thrown onto his desk with enough force to make the top of the desk fly up. Other students had scratches, fingernail marks and assorted minor injuries from rough handling. As here, plaintiff was a longtime teacher with a spotless record until the incidents in question. The court found plaintiff's conduct to be remediable and overturned the discharge.

The board cites the Slavin case to distinguish the level of harm

done. It points to the court's finding that no serious harm was caused. However, we have already held that the evidence of harm was slight to highly speculative in this case as well.

We find the facts of the Slavin case to be more serious than in the instant case. There, the evidence was clear that Slavin had overreacted on several occasions within a six-week span. Here, there is only one day in question, although the course of mistreatment was prolonged by the trips to the closet. As an aside, we note that we do not consider the closeting of Terry as serious misconduct. The evidence was that Terry had to be isolated. However, the sheer physical size of the class, along with its volatile makeup, mandated that the isolation had to be complete. Also, Slavin appeared to resort to force following considerably less provocation than did plaintiff here. There is nothing in the Slavin case to suggest that Slavin had run out of nonphysical ways of dealing with his unruly charges. We also note that Terry was but six years old; it goes without saying that a child of that age might not respond to solely verbal or psychological discipline.

Concerning the alleged breach of board policy in plaintiff's administering corporal punishment without a witness, we find this to be a minor consideration. The record reveals that the "principal only" rule of paddling students was observed more in the breach than in actuality. Also, there was evidence that the principal, due to lack of time and personnel support, had instructed the teachers to try to handle discipline problems themselves.

Finally, we have examined plaintiff's unrepentant attitude immediately following the incident. Nonetheless, it is clear that the conduct would not repeat itself. Plaintiff stated as much to principal Davis, who apparently didn't care or refused to believe her. Plaintiff also sent a letter to the board indicating that her conduct would not be repeated. Dr. Tourlantes, who actually examined plaintiff for two hours, concluded that plaintiff could conform her conduct to her superiors' wishes. We find such testimony to be convincing evidence that plaintiff's conduct was remediable.

In short, we find that the hearing officer's conclusion that plaintiff's conduct was irremediable was against the manifest weight of the evidence. Accordingly, the judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

STOUDER and WOMBACHER, JJ., concur.