ROSEMARY HEGENER, Plaintiff-Appellant, v. BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—87—1528

Opinion filed January 11, 1991.

704

Mildred F. Haggerty, of Haggerty & Koenig, Chartered, of Chicago, for appellant.

Patricia J. Whitten and Camille E. Willis, both of Board of Education of City of Chicago, of Chicago, for appellees.

JUSTICE GORDON* delivered the opinion of the court:

Plaintiff, Rosemary Hegener, a tenured high school teacher, appeals from the trial court's order, on administrative review, affirming the decision of the Illinois State Board of Education (hereafter State Board) to dismiss her as a teacher for the Chicago Board of Education (hereafter Chicago Board) because of "conduct unbecoming a teacher." She contends that the conduct in question did not constitute sufficient "cause" for dismissal. She also contends that even if the conduct would have been sufficient cause, it was remediable and, because she was not given the proper written warning, her dismissal was improper. Though we find sufficient evidence to support the finding of cause, we reverse on the basis that the cause was remediable and, without the proper written warning, the State Board lacked jurisdiction to dismiss her.

On July 18, 1984, the Chicago Board initiated proceedings to dismiss plaintiff as a teacher in the Chicago public school system, charging her with "conduct unbecoming a teacher," including having improper sexual contacts with one former and one current student. The

---

*Justice Pincham heard the oral argument in this case, and following his resignation, Justice Gordon was substituted and he listened to the tape of oral argument and read the briefs and record.

specific conduct which formed the bases for the charge included:

1. From April to approximately December 1982, plaintiff had an inappropriate and unprofessional relationship with a 17-year-old female, subsequently identified as A.P., beginning while the girl was a student and continuing after her graduation, including:

A. Buying the girl numerous gifts;

B. Treating the girl to outings at numerous restaurants;

C. Frequently telephoning the girl for social reasons totally unrelated to any legitimate professional purpose;

D. Frequently sending and giving her letters and cards of a social and personal nature;

E. Offering the girl a credit card;

F. Frequently persuading the girl to spend the night at her residence;

G. "Rigging" a school event in order to ensure that the girl would win a prize; and

H. Fondling, caressing and touching the girl's breasts during an overnight stay at her residence.

2. During the 1982-83 and 1983-84 school years, plaintiff had an inappropriate and unprofessional relationship with a 14-year-old female student, subsequently identified as L.R., including:

A. On one occasion, kissing the girl on the mouth while on school premises;

B. On one occasion, caressing, stroking and rubbing the girl's legs and thighs while on school premises and in the presence of various students and staff persons;

C. On one occasion, hugging and kissing the girl, fondling her breasts, and addressing her with romantic terms of endearment;

D. Touching and stroking the girl's hair and holding hands with the girl while on school premises;

E. Frequently driving the girl to and from school;

F. Spending unusual amounts of time with the girl, both inside and outside school;

G. Frequently persuading the girl to visit her residence, sometimes to spend the night;

H. Purchasing numerous gifts for the girl; and

I. Treating the girl to meals at restaurants.

Charging that this conduct was "irremediable," the Chicago Board served notice on plaintiff, without first providing the written warning that would have been required had the conduct been deemed remedi-

able (Ill. Rev. Stat. 1987, ch. 122, par. 34—85), and suspended her from teaching until a hearing could be held by the State Board on her dismissal.

THE HEARING BEFORE THE STATE BOARD

Commencing October 3, 1984, a hearing was conducted by a hearing officer appointed by the State Board. The evidence at the hearing disclosed that plaintiff, a married woman with two sons, was a tenured physical education teacher who first began working for the Chicago Board in 1962. Her assignments had included stints at Francis Parker School from 1962 to 1964, Carl Schurz High School from 1964 to 1970 and, after a six-year maternity leave, Lucy Flower High School from 1976 until her suspension in 1984. While at Lucy Flower High School, she received an "excellent" teaching rating for each of her first four years and a "superior" rating, the highest possible rating in the Chicago public school system, for each of the remaining years up until the date of her suspension. Additionally, she served as chairperson of the physical education department from 1980 to 1984. The conduct which formed the bases of the charge against plaintiff allegedly occurred from 1982 to 1984.

It is not disputed that during the time plaintiff taught in the Chicago public school system, she was generally well regarded as a committed teacher, often participating in such extracurricular activities as senior prom, graduation luncheon and color guard, and developed personal friendships with many of her students. A number of these friendships continued after the students graduated. Her activities with these students included going on joint shopping trips, giving gifts, privately dining with students, and having students visit and, at times, remain overnight at her home. At the hearing, plaintiff explained these relationships:

"I felt that I was trying to be what I did not have growing up myself. I wanted to make myself an available figure so that they had someone to talk to if they had a problem that could not be discussed with a family member or even a friend who might tell. I wanted to be someone who would be there in case no one else possibly could be there. I wanted to be a support system. I wanted to be someone that they could trust and know that whatever they told me was going to go no further. *** I liked them."

Several of plaintiff's former students testified on her behalf and told how they valued their friendship with her. Prior to receiving notice of the charge involved in this case, plaintiff was never advised that any

of these relationships were inappropriate or unprofessional.

As indicated, the relationships which were the bases for the charge for which plaintiff was dismissed developed while she was a teacher at Lucy Flower High School. Lucy Flower is a four-year high school located on the west side of Chicago. Only female students were enrolled at Lucy Flower until 1982, when the first male student was admitted. The evidence at the hearing was replete that during the time that plaintiff was teaching at Lucy Flower it was not uncommon to see teachers holding the hands of students or offering them occasional transportation to and from school. The evidence showed that it was relatively commonplace for students to exhibit demonstrative affection to their teachers and to form interpersonal (one on one) attachments with them. Students would often assist specific teachers and regularly spend time in their company outside of actual classroom hours. Also, several teachers were shown to have given small gifts to students at various times. And, there was evidence that in at least one instance, a teacher, other than plaintiff, asked a student to stay overnight at her house. There was no evidence of any prior disciplinary action taken against any of these teachers or students.

THE RELATIONSHIP WITH L.R.

Plaintiff's relationship with L.R., though later in time than her relationship with A.P., triggered the investigation which led to the charge of "conduct unbecoming a teacher" and therefore will be described first. The formal investigation concerning plaintiff's relationship with L.R. was precipitated by a November 29, 1983, letter, prepared by Phyllis Banks, a physical education teacher at Lucy Flower, accusing plaintiff of engaging in lesbian conduct with L.R.

According to plaintiff's testimony, her relationship with L.R. began late in May of 1983 when L.R., who was never enrolled in any of plaintiff's classes but who knew about plaintiff's willingness to offer advice to students through conversations with her cousins and friends, telephoned plaintiff to seek dating advice about attending a dance with a certain boy. According to L.R.'s testimony, she first met plaintiff in June of 1983 through friends and cousins when she began "hanging around" the gym between classes. Thereafter, the relationship developed into a personal friendship.

The alleged incident which triggered the accusation of sexual impropriety between plaintiff and L.R. occurred on June 15, 1983, shortly before school let out for the 1982-83 school year. Several witnesses, including Banks, Robert Ogilvie and Demetrius Armstrong, who were physical education teachers at a vocational school which

shared Lucy Flower's gymnasium facilities, and two students, S.W. and P.L., testified that they saw plaintiff and L.R. in a compromising position in the gymnasium office, which was shared by four different teachers, while school was in session and while several people were present. Though their accounts varied, Banks, Armstrong, S.W. and P.L. essentially stated that while L.R. sat on the window sill fully clothed with her legs spread, plaintiff stood between her legs, with her back to the girl, and either massaged the girl's thighs or fondled the girl's hair or ears while the girl played with plaintiff's hair. Ogilvie, who initially did not testify concerning the incident but who then recalled it upon prompting by the school board's attorney, stated that while L.R. sat on a desk in the office, plaintiff stood in front of L.R. with her arms around L.R.'s waist. According to these witnesses' collective testimony, this incident took place in a relatively small space, during a time when many people and students were coming into and going out of the gymnasium and gymnasium office and lasted as long as 40 minutes. Another witness, Hazel Johnson, who was a physical education teacher at Lucy Flower, testified that she too was in the crowded gymnasium office on June 15 and had seen L.R. sitting on the window sill and plaintiff seated between her legs but did not see any improper physical contact by plaintiff. Both plaintiff and L.R. acknowledged in their testimony that they were in the gymnasium office on June 15 but denied that they were engaging in any improper conduct at the time. Plaintiff also testified that on several occasions prior to this alleged incident, she had reported Banks to school authorities for excessive personal use of the telephone in the office and had incurred Ogilvie's anger in scheduling gymnasium time for his class.

Though none of the witnesses to the alleged June 15 incident reported the incident to school authorities before the end of the 1982-83 school year, rumors began spreading throughout Lucy Flower regarding that alleged occurrence.

When school resumed in September for the 1983-84 school year, rumors regarding that incident were widespread throughout the school. On the first day back, plaintiff and Banks had a confrontation over those rumors, with plaintiff warning Banks that if Banks persisted with false accusations that she and L.R. had engaged in a lesbian act, she would take legal action against Banks. Banks, in turn, warned plaintiff that if she ever saw her in a situation with a student which she deemed questionable, she would report it to the student's parents. After this confrontation, plaintiff reported Banks' accusations to Hortense Bright, the principal of Lucy Flower, and asked her

to take some action to stop Banks from repeating them as they were false.

Bright testified that she advised plaintiff that she had already heard about the alleged June 15 incident and further told plaintiff that she had earlier heard a similar allegation about plaintiff's relationship with a former student from that student's parent. Bright testified that although she knew the student to be A.P., she did not then choose to identify her to plaintiff nor elaborate any of the details of the mother's accusation but merely informed plaintiff about that allegation "to make her aware of it." According to Bright, plaintiff acknowledged that she had heard rumors about her relationships with students but denied being involved in any improper relationships with any students, current or former. Bright stated that she did suggest that plaintiff and Banks sit down with her to resolve their differences but that plaintiff refused, stating that she did not wish to have any further conversations with Banks. Within a day thereafter, Banks met with Bright and made her first oral charge concerning the alleged June 15 incident to a school authority. Banks, too, declined Bright's suggestion that she sit down with plaintiff to resolve their differences.

From that point forward, the working relationship between plaintiff and Banks became very strained and hostile, with interpersonal communication becoming virtually nonexistent and constant complaining to school authorities by each of them regarding the other's conduct. For example, on one occasion, plaintiff complained to Hortense Bright that Banks was always watching television during school hours and Banks then complained that plaintiff had removed the television set from the gymnasium office. Additionally, disputes arose between them over plaintiff's treatment of S.W., one of the previously identified students who witnessed the alleged June 15, 1983, incident. These disputes involved matters such as plaintiff's alleged unfair treatment of S.W. while she was enrolled in one of plaintiff's classes and plaintiff's complaint to school authorities that S.W. had deliberately disrupted one of plaintiff's classes. On both occasions, Banks interceded on S.W.'s behalf and managed to have S.W. transferred out of plaintiff's class. The evidence presented at the hearing showed that S.W. had a close, personal relationship with Banks, beginning approximately two years prior to these incidents. S.W. testified that she used to "hang around" the gymnasium with Banks, assist Banks in posting grades, and, during the course of their friendship, stayed overnight at Banks' home on seven occasions as a babysitter for her children. Additionally, she stated that Banks had on occasion given her gifts, provided her transportation from school and taken her to a pizza restau-

rant. Hortense Bright testified that she was aware of the fact that S.W. and Banks spent a great deal of time together at school.

According to Hortense Bright, as a result of the altercation between Banks and plaintiff over the June 15 incident, the climate at school was "terrible." She explained:

"It always seemed that the kids had something to say. They were seeing—well, I would say seeing things that may not have been there. I don't know, but it just seemed that everything revolved around Mrs. Hegener, [L.R.], Mrs. Banks, [S.W.]. It just didn't seem that a day passed without somebody coming to me telling me something about one of the four of them."

Plaintiff testified that she continued to press Hortense Bright, the principal, to stop the rumors being spread by Banks and S.W. which were ruining her reputation, while Banks testified that she orally pressed Bright to act on her accusations against plaintiff regarding the June 15 incident. Bright testified that she told Banks that there was nothing she could do because it was basically Banks' word against plaintiff's word. In November, Banks prepared and signed a one-sentence letter of accusation regarding the incident, which she asked her fellow teachers, Demetrius Armstrong and Robert Ogilvie, to cosign and which she then submitted to Bright. That letter, dated November 29, 1983, stated that "[o]n June 15, 1983 I observed Mrs. Hegener in what could be interpreted as a lesbian relationship with a female student in the gymnasiumnasium [sic] office."

Evidence was presented at the hearing that Banks had on previous occasions threatened to spread rumors or had in fact spread rumors that other physical education teachers who worked with her were lesbians. A teacher (M.S.), who was the chairperson of the physical education department at the school where Banks had been assigned prior to being transferred to Lucy Flower, testified that Banks, in order to avoid an unwanted teaching assignment, had pushed her down and threatened to spread a false rumor that she was having an affair with a female student. Additionally, both plaintiff and L.R. testified that on numerous occasions they heard Banks stating that another of the physical education teachers at Lucy Flower (M.K.) was a lesbian. Banks denied either making the threat to M.S. or making the accusation about M.K.

After receipt of the November 29, 1983, letter, Bright contacted the district superintendent regarding the charge and formal proceedings commenced. Despite the continuation of rumors at Lucy Flower regarding plaintiff's relationship with L.R., plaintiff continued to be seen with L.R. While at school, the girl spent much of her free time

in plaintiff's company where, according to the testimony of L.R. and plaintiff, they discussed various subjects, ranging from dating questions to the girl's Bible studies. There was undisputed testimony that plaintiff took L.R. to lunch on several occasions, sometimes during the school day, once attended church with the girl, and drove the girl home from school on several occasions, mostly during the time period of May through December 1983, when plaintiff's car pool driver was on maternity leave. In addition, the evidence was undisputed that plaintiff on various occasions sent her friendship cards and a birthday card and gave her gifts consisting of such items as a pullover shirt, a blouse, and socks in L.R.'s favorite colors. From June of 1983 until early in 1984, L.R. spent approximately seven to eight nights at plaintiff's house, mostly at the request of L.R. or her mother. The evidence is undisputed that the girl's mother always approved the overnight stays. It may be noted that L.R.'s mother remained friendly to plaintiff throughout these proceedings.

Additionally, several of the witnesses to the alleged June 15 incident testified regarding other alleged improprieties between plaintiff and L.R. Robert Ogilvie testified that as early as March of 1983, he had seen plaintiff and L.R. overtly kissing each other on the lips in the gymnasium office during the school day. He stated that in June, either before or after the June 15 incident, he again saw plaintiff and L.R. kissing and plaintiff "playing up under her [L.R.'s] dress" in the gymnasium office during the school day. And, he stated that in October of 1983, he again saw plaintiff and L.R. kissing and plaintiff fondling L.R.'s breasts in a room attached to the gymnasium office during the school day. Ogilvie did not report any of these incidents to Hortense Bright or any other Lucy Flower school authority but, instead, reported all of them to Banks. Demetrius Armstrong testified that he had seen plaintiff and L.R. holding hands in school on more than 10 occasions and plaintiff offering transportation to L.R. on 5 to 10 occasions. When Armstrong was asked if it was unusual to see a teacher holding hands with a student, he responded that it was not unusual but that their handholding was different than others because it "implied a closeness" that went beyond a teacher-student relationship. When asked if teachers frequently offered transportation to students, he responded in the affirmative. Though not clear from the record, it would appear that Armstrong never reported the handholding or the offers of transportation to school authorities. Both Ogilvie and S.W. corroborated seeing plaintiff holding hands with L.R., but, again, neither reported the incidents to school authorities. L.R. denied any handholding with plaintiff on school premises, though she acknowl-

edged holding hands with other teachers, and plaintiff testified that she held hands with L.R. only once, and that it occurred outside school property.

L.R. further testified that because of the rumors which arose at Lucy Flower as a result of the alleged June 15, 1983, incident, various teachers developed a negative attitude toward her and she became very depressed. She stated that because of the ensuing pressure she had to transfer from Lucy Flower and complete her high school education elsewhere.

The hearing officer in his written decision specifically disbelieved the occurrence of the alleged June 15, 1983, incident, finding:

"that a preponderance of the evidence in the record when the record is considered as a whole does not support the allegation that on or about June 15, 1983, Rosemary Hegener positioned her body between the legs of a female student and caressed, stroked and rubbed the student's legs and thighs. Rather, I find that at most Hegener positioned herself in close proximity to a female student who was sitting on a window ledge with her leg's askew, and that their proximity implied intimacy to some observers and merely inappropriate contact to others. I also find that when the physical layout and size of the gymnasium-nasium [sic] office is considered together with the activity going on in that room on the day in question, it would not have been unusual for two people to rub against each other for short periods of time. Stated another way, it is more likely that some people in that room on the day in question saw what they wanted to see regarding Hegener and [L.R.] than it is likely that the two of them were intentionally engaging in intimate physical conduct."

In rejecting the testimony of each of the witnesses who were alleged to have observed this incident, the hearing officer stated:

"I find Banks' testimony to be unreliable and I find her to be a discredible witness. Her testimony is laced with sensational comments and embellishments. In a real sense the incident did grow in Banks' mind because it did not happen as she testified. She altered her testimony on several occasions and was unable to account for a large block of time during the period in question. [P.L.] and [S.W.] discredit each other as well as Banks. They appeared to be loyal couriers and sycophants for their champion, Phyllis Banks, and their testimony lacks any ring of truth. Beyond the superficial contradictions, however, I found Banks and [S.W.] to be hostile witnesses with obvious and in-

tense prejudices. I credit those witnesses who recounted unrelated episodes where they were subjected to Banks' wrath and [S.W.'s] invectives. Finally, I must discredit Banks' version (and that of Ogilvie and Armstrong—who likewise contradicted Banks as well as each other) because of Banks' failure to report the incident until the following September and only then after Hegener went to Bright herself and laid out what was going on. Furthermore, there are hints in the record that the November 29th note was the result of prompting by Bright after Banks asked the principal why no action was being taken against Hegener. Considering Hegener's reaction to this note and her threats of legal action, Ogilvie and Armstrong may have found themselves entangled in an episode they never bargained for when Banks solicited their signatures. It is noteworthy that Armstrong made no effort to complain about Hegener other than by signing the note Banks brought to him. As for Ogilvie, *** his testimony is totally unreliable. *** Indeed, Ogilvie could not recall the incident at all until he was prompted by the Board's counsel. Ogilvie testified that Hegener and L.R. were sitting on Hegener's desk."

The hearing officer also specifically disbelieved and rejected the March, June, and October 1983 kissing and fondling incidents attested to by Robert Ogilvie. Regarding Ogilvie's testimony on those alleged incidents, the hearing officer found it "unbelievable that in the middle of the day in an office belonging to four teachers and accessible to teachers and students alike, a teacher and a student would engage in such blatantly inappropriate physical conduct," and found Ogilvie to be "generally a discredible witness" and "a wholly unbelievable witness."

Thus, the hearing officer rejected the improper sexual contact charges as unproven and unbelievable. His findings of impropriety with respect to L.R. were limited only to the following conduct:

1. Holding hands with L.R. on school premises;

2. Frequently driving her to and from school;

3. Spending unusual amounts of time with her both inside and outside school; and

4. Purchasing numerous gifts for her.

He further found that such conduct was actionable primarily because it exacerbated existing rumors and controversy, albeit that such rumors and controversy were unwarranted. He noted:

"In this case, Hegener encouraged and nurtured the questionable relationship when controversy, much of it unfair, was

all around her. Instead of containing her friendship with Robinson and her family to outside the school, it appears that Hegener deliberately snubbed her nose at her detractors thereby adding fuel to their mostly unfounded rumors. Had Hegener kept her private relationship out of the school environment, there would be no basis to complain. She deliberately entangled her professional life with her social life.

This is not a situation where a teacher is forced to refrain from appropriate or innocent conduct merely because others maliciously spread rumors. It was never proper for Hegener to lavish so much attention on one student. However, Hegener compounded the problem by increasing the questionable conduct at the very time when professional prudence and a minimal amount of judgment required her to maintain a more discreet posture. This is why in the context of this case I agree that the proven allegations *** amounted to inappropriate and unprofessional conduct."

THE RELATIONSHIP WITH A.P.

Plaintiff's relationship with A.P. was first brought to the attention of Hortense Bright, principal of Lucy Flower, when A.P.'s mother telephoned her in March of 1983 and reported that her daughter had told her that on November 29, 1982, when A.P. was spending the night at plaintiff's house and sleeping in the same bed with plaintiff, plaintiff fondled her breast. After receipt of the Banks letter of November 29, 1983, concerning L.R., Bright initiated a formal investigation against plaintiff regarding her relationship with A.P. as well.

The evidence presented at the hearing on plaintiff's relationship with A.P. consisted of the testimony of A.P., plaintiff, A.P.'s parents, and Hortense Bright and certain correspondence from plaintiff to A.P. There was no testimony from any other teachers or students or other witnesses. The evidence established that plaintiff first met A.P. in the fall of 1981 when A.P. enrolled in a senior Health and Physical Education class plaintiff taught. Their relationship began in a formal and conventional context, in which plaintiff, A.P.'s teacher, counseled the girl, who was one of the top students in the class, about her written work and other school-related activities. Sometime between February and May of 1982, however, the relationship developed into what both the plaintiff and A.P. characterized as a personal friendship. A.P. testified that during the few remaining months before her June 1982 graduation from Lucy Flower, she accompanied plaintiff once to a shopping mall, once to a pizza restaurant and once, in the company of two

other students, to a hamburger restaurant. She stated that during this same time period, she began visiting plaintiff's home for periods of time after school and, while there, met plaintiff's family and, on occasion, watched television. Although A.P. was not certain of the total number of these daytime visits, she estimated that there were no more than five while she was still in school before graduation. She further stated that on one of these visits, plaintiff chauffered her to and from a party. Plaintiff recalled that she did take A.P. to the pizza and hamburger restaurants but did not take her to the shopping mall during this time period. She further testified that A.P. only visited her home on the day prior to her graduation, when she did chauffer A.P. to and from a party. Ruther McKitchen, A.P.'s mother, testified that it was understood that whenever A.P. wanted to go anywhere after school, she had to obtain her permission. She did not testify that she was unaware of any of these trips or opposed to them. It was undisputed that during this period, plaintiff gave A.P. a few gifts, including a small silver unicorn figurine for her prom, a pair of designer shoestrings and an inspirational plaque for her 17th birthday on June 5 and a Ralph Lauren polo shirt for her graduation. Plaintiff also sent A.P. an envelope containing some extra tickets for her graduation, after the girl asked for them.

A.P. testified that the envelope containing the extra graduation tickets included a letter reminding her of all the nice things plaintiff had done for her and asking when A.P. was going to start doing nice things for plaintiff. Though the letter was never produced at the hearing, A.P.'s parents, Ruther McKitchen and Raymond Suggs, provided corroborating testimony regarding the letter and its contents. Plaintiff denied ever sending such a letter. A.P. also testified that she received a graduation card from plaintiff, evidently containing a poem, entitled, "If, for girls," setting forth certain ideals worthy of a young woman's aspirations. It was apparently modelled after the Rudyard Kipling poem, "If." Plaintiff testified that the card was intended to be "inspirational." This card also was never produced at the hearing.

Shortly before A.P.'s graduation, plaintiff arranged for her to win a table prize of cologne, donated by a friend of plaintiff's husband, at the senior luncheon. This was accomplished by deliberately seating her in the prize-winning chair at a table which had that cologne as the table prize. There was one such prize at each of the tables at the luncheon. Plaintiff testified that she arranged for A.P. to win and attempted to make similar arrangements for certain other students because she wanted to reward them for their help throughout the school year.

After A.P.'s graduation from Lucy Flower, plaintiff's relationship with A.P. became more intense. A.P. testified that on June 19, about a week after the graduation, and thereafter on approximately 7 to 11 additional occasions up until approximately November of 1982, she, mostly at plaintiff's invitation but always with her parents' permission, spent the night at plaintiff's residence. Plaintiff testified that there were only three such overnight visits. During this period following graduation, between June to September 1982, they would be in telephone contact either on a daily basis, according to A.P., or every other day, according to plaintiff, except for vacation periods. A.P. testified that at one point the calls became so numerous that she thought plaintiff was becoming "overly possessive." She nonetheless stated that she was the one who initiated most of the early telephone calls and that even later on, she tended to call plaintiff as often as plaintiff called her. Plaintiff testified that the calls were mostly initiated by A.P. It is undisputed that they discussed numerous subjects during these conversations, including A.P.'s school problems, her future plans, "boys" and various birth control methods. Plaintiff also acknowledged that during that post-graduation period she sent 20 greeting cards, two letters and "little notes here and there" to the girl, offering encouragement and various expressions of their close friendship including references to A.P. as "honey" or "baby."

Concurrently, plaintiff continued giving relatively small gifts to A.P., including a long-sleeve polo shirt, two books, a pair of candy striped pajamas, a Mickey Mouse sweat shirt, a camisole, an Izod sweater, and a circle pin. Some of these gifts were items which plaintiff previously owned, while others were items she specifically purchased to give to A.P. During this period, A.P. gave the plaintiff some poems she had written and a couple of greeting cards. They also continued to meet for outings, including once to a shopping mall, several times to restaurants, and once to the circus. On some occasions, they would visit these places alone, while at other times it would be in the company of plaintiff's family. Plaintiff or her husband would always pay the costs for these outings. When A.P. was asked how she felt about plaintiff during this period, she stated that she loved her and thought of her as more than a friend—as part of her family.

Though the telephone calls between plaintiff and A.P. were not as frequent after September of 1982, their relationship continued to be very close until either November or December of 1982. It was during this latter period that Raymond Suggs, A.P.'s father, told plaintiff that his daughter did not wish to see or talk with her again and that he did not wish the plaintiff to call his daughter again. According to

Raymond Suggs, his admonition to plaintiff followed shortly after his daughter told him that on November 29, 1982, upon spending the night at plaintiff's house after going to the circus with plaintiff and her family, she and plaintiff slept in the same bed, at which time plaintiff reached over and fondled her breast. A.P. testified that she customarily slept in the same bed as plaintiff when she stayed overnight. A.P. further testified that she related the November 29 incident to her father about three weeks after it allegedly occurred. She also acknowledged that on November 13 she learned that she was pregnant, that she was upset about the pregnancy at the time of the alleged November 29 incident and that she had an abortion in early December. Suggs testified that his daughter's disclosure to him was made only a few days after the alleged incident. He stated that he was not aware of his daughter's pregnancy at that time. A.P. confirmed in her testimony that she did not disclose her pregnancy to either of her parents.

Plaintiff denied that she fondled A.P.'s breast or ever engaged in any sexual contact with A.P. She also denied that A.P. spent the night with her on November 29, 1982. She did acknowledge that they had gone to the circus but believed that the trip had occurred in early November 1982, having been sponsored politically in connection with the then forthcoming November 7, 1982, election. She stated that A.P. never spent a night at her home after early November 1982. She did testify, however, that she and the girl slept in the same bed on one occasion in September, when her husband was away and when the girl was frightened that she would be attacked by plaintiff's aggressive pet terrier, which had recently bitten a neighbor, and by plaintiff's large cat, which looked like a raccoon. She denied any improper conduct on that occasion.

Raymond Suggs testified that after his daughter told him about the alleged November 29, 1982, incident, she was subdued and dispirited, and appeared to suffer a diminution of self-esteem. As previously noted, this time frame coincided with the period of A.P.'s pregnancy and subsequent abortion, of which neither he nor his wife was aware. According to A.P., friendly contact between her and the plaintiff continued for a short time after the alleged November 29, 1982, incident, although they were no longer "as close." She testified that the contact consisted solely of telephone calls, which either of them might initiate, but that the calls stopped within a month. Plaintiff, on the other hand, claimed that her relationship with A.P. continued to May 1983. She testified that they continued to talk on the telephone on a biweekly basis and met on three to four occasions for lunch or shop-

ping. She stated that in all but one instance, these contacts were initiated by A.P. She further stated that she sent a number of cards and a letter to A.P. in December of 1982 to lift her spirits about her pregnancy. The cards, some of which were admitted into evidence, were all "friendship" cards, signed, "love, Rosemary." The letter was one of encouragement containing such inspirational thoughts as: "Be that dynamic go getter again [A.], be *who you are* in spite of your mistakes."

According to the testimony of Ruther McKitchen, A.P.'s mother, her daughter first told her about the alleged November 29 incident in December of 1982. A.P. testified that she told her mother about the incident in March of 1983. McKitchen stated that when A.P. spoke to her about the incident her daughter was still upset. She stated that she first called Hortense Bright, the principal of Lucy Flower, in March of 1983 to inform her of the alleged incident. At that time, she further advised Bright that in December of 1982 she had started intercepting plaintiff's cards to her daughter and had retained them if the principal wanted to see them.

Bright testified that she took no formal action at the time McKitchen called her because A.P. was not then a student at the school. She stated that she did begin to scrutinize plaintiff's conduct at the school more closely but did not observe any improprieties. She further stated that to her knowledge nobody else at Lucy Flower was aware of the accusation concerning A.P. and that she did not inform plaintiff about this accusation until her meeting with plaintiff in September 1983.

The hearing officer explicitly stated in his findings that the charges regarding the alleged November 29, 1982, incident, like the charges regarding the alleged June 15, 1983, incident with L.R., were not sufficiently supported by the evidence. In so doing, he noted that A.P.'s "lack of candor about her pregnancy casts a long shadow over her testimony regarding her relationship with Hegener in November and December, 1982." He also noted that he had substantial problems with A.P.'s testimony concerning the overnight stays and stated that "[i]t could well be that on occasions when she told her parents that she was sleeping at Hegener's she was in fact sleeping with her boyfriend." He further expressed grave doubts about the credibility of A.P.'s statement that she and plaintiff customarily slept in the same bed whenever she stayed overnight. Additionally, although he did not accept plaintiff's explanation as to why they slept in the same bed in September, he did not find that any improper contact had occurred at that time.

Thus, here as with respect to L.R., the hearing officer found in-

sufficient evidence to support any improper sexual contact. His sole findings of impropriety were predicated upon the lesser charges involving the following conduct:

1. Buying the girl numerous gifts;

2. Treating her to outings at numerous restaurants and banquets;

3. Frequently telephoning her for social reasons totally unrelated to any legitimate, professional purpose;

4. Frequently sending and giving her letters and cards of a social and personal nature;

5. Frequently persuading her to stay overnight at her residence; and

6. "Rigging" a school event in order to ensure that she would win a particular prize.

The hearing officer found this conduct to be inappropriate and unprofessional because plaintiff had used her professional position to develop an intense and intimate relationship with a student. The hearing officer further found "that by establishing a close confidential relationship as an adult with this seventeen year old child, by discussing birth control and sexual relations, by discussing career goals, personal problems, conflicts in school, by shopping, eating and socializing together on a regular and continual basis, the Teacher was usurping the role and function of [A.P.'s] *** parents, and that she continued to do so after the child's father told her to stop."

EXPERT WITNESS TESTIMONY

Dr. Evin Moore, who identified himself as a psychiatrist for children and adults, testified as the school board's expert. His was the only expert testimony offered as to the impact of plaintiff's conduct upon A.P. and L.R. and as to whether any damage was sustained by them or by the school as a whole. He testified that he never examined either of the two students or plaintiff, but rendered his opinion solely on the basis of hypothetical questions. The hypothetical question concerning A.P. incorporated all of the evidence offered by the school board against the plaintiff, including the alleged November 29, 1982, breast fondling incident and A.P.'s version as to the number of instances that she and plaintiff slept in the same bed together, all of which were both subsequently rejected as unproven by the hearing officer. Based on this hypothetical, Moore stated that the relationship was destructive to the girl's personal development, noting:

"In the ideal formation of the ego ideal or the person to whom one wishes to model, the important thing is that the child has

control over that relationship. That is, it is initiated by the child. The impetus of the things that were stated in the hypothetical prompted me to state that the primary impetus of this relationship emanated from the teacher; that this was something that was—that the student was induced to respond to and this does not hold well in the formation of healthy ego ideal *** ."

He further explained that the primary reason why the relationship was destructive was because "the primary impetus for the relationship occurred on the part of the teacher as opposed to this being in the primary control of the child. It was not for the child's needs; it was apparently for the teacher's needs."

When Moore was asked specifically on cross-examination what role the November 29, 1982, incident played in his opinion, he stated that his opinion was "in terms of the total hypothetical, not in terms of one instance." He conceded that an unwanted pregnancy would have a negative impact on a 17-year-old.

As with respect to A.P., the hypothetical question concerning L.R. incorporated all of the negative evidence offered by the school board, including the alleged June 15, 1983, incident as well as the alleged kissing and fondling incidents testified to by the board's witnesses, which were subsequently rejected as unproven by the hearing officer. Based on this hypothetical, Moore stated that this relationship also was destructive to L.R.'s health and development, noting:

"This is a stage during which the child is still struggling with the sense of character formation and sexual identity, and thus [it] is exceedingly intrusive into the child's life for a person where the age differences appear to be so great and the person appears to have such undue influence upon their life that this would tend to attract on the one hand in a rather seductive fashion of the child and cause the child to have not a great deal of ability to withstand the pressures that were associated with this."

But, when Moore was asked what was destructive about both relationships *aside from the physical contact*, his answer included physical contact:

"The quality of the relationship in terms of the holding of hands, the kissing, the stroking, the gifts, seems to me to be out of proportion to the quality that one would expect generally in a usually [*sic*] teacher child relationship."

Moore further testified that the relationship depicted in the hypothetical question concerning L.R. would have the following impact on

students who observed the aspects of that relationship:

"[T]he range of reactions vary from severe revulsion to a sense of—there could be a large range of reactions that could be seen from a large range of students on where they observed it. On another level, you often would see children who become angered by observing such hypothetical situations as occurring, that the student would feel unfairly treated, that they could not attain similar relationships, that they could not attain grades that they felt they might deserve, that there was favoritism shown toward certain students.

I think you may see a whole host of reactions like this that would not be in the best interest of the student's [sic] body responses."

And, Moore testified that the relationship depicted in that hypothetical would have the following impact on teachers who observed the relationship:

"[T]he teacher[s] again similarly would show a range of reactions. Primarily though I think that by virtue of the age of the teacher and hopefully more positive sexual identity about themselves, they would be in a position or in a posture to develop severe resentment towards the person who was involved in this behavior in the sense of excessive sympathy initially, but if this were to continue, despite the warnings or admonitions of the teachers or persons who had seen this, a sense of rejection of the person so involved."

HEARING OFFICER'S DECISION

After reviewing the evidence presented, the hearing officer concluded that there was sufficient impropriety in plaintiff's conduct to constitute cause even though the charges of sexual improprieties were not proven. He noted:

"In this case, Hegener did not merely allow herself to become involved in the lives of two of her students (and such involvement, although not alleged, clearly existed with other children as well), but sought out and encouraged emotionally intimate relationships with these children. The air of intimacy became so apparent that other teachers and students imagined or construed a sexual relationship. However true it may be that Banks, [S.W.], Armstrong and Ogilvie manufactured stories of physical intimacy, the rumors took on a life of their own because Hegener's outward conduct toward [L.R.] on school premises encouraged these rumors. In the case of [L.R.], He-

gener was not merely a passive victim. She was the moving participant in a disruptive, unprofessional relationship.

The findings regarding [A.P.] are perhaps more serious. In this instance, the Teacher became so emotionally entangled with the child that they communicated everyday, by letter, by telephone or both. She bought her presents, gave her items of her own clothing, including intimate apparel. She regularly took A.P. out to eat and entertained her in her home. She became demanding, intrusive, intimate and possessive of the child's affections in an overwhelming way. On at least one occasion, Hegener slept in bed with the child although reasonable alternatives to this awkward and questionable circumstance were available. On another occasion Hegener asked [A.P.] what the girl was going to do for the Teacher. After [A.P.'s] father told the Teacher to cease contacting his daughter, she continued anyway. She also used a school function to engage in dishonest conduct by rigging a contest of chance so that [A.P.] would win a prize which the child had previously selected."

The hearing officer further concluded that plaintiff's conduct was irremediable because it: (1) covered a long period of time, (2) was deliberate and calculated, and (3) caused severe damage to A.P., L.R. and the school generally. In finding damage to A.P. and L.R., the hearing officer apparently relied heavily on Dr. Moore's testimony. In assessing Dr. Moore's testimony, the hearing officer did recognize that the hypothetical facts upon which he based his opinions included the allegations of the various sexual contacts which were ultimately rejected as not proven by the hearing officer. Nonetheless, he refused to accede to the contention that Moore's testimony was therefore without dispositive value, stating:

"[I]t is clear from Moore's testimony that one of the most damaging aspects of these relationships was the domination and emotional demand by the Teacher who served as a role model for impressionable adolescent girls. My interpretation of Moore's testimony is that he would reach similar conclusions even without the overt physical contact which was part of the hypothetical questions but not proven in this case. The critical feature of Moore's analysis was that the relationships were to serve the needs of the Teacher and not of her students. This conclusion would seem to stand regardless of whether there was physical sexual contact."

On administrative review, the circuit court of Cook County affirmed both the finding of cause and the finding of irremediability,

basing its affirmance of the latter finding primarily on the testimony of Dr. Moore.

OPINION

It should be noted that for purposes of this appeal, the defendants have totally abandoned any charges of sexually improper contact which were rejected by the hearing officer and stand only on the lesser charges left standing by the hearing officer.

Plaintiff initially contends that the hearing officer's conclusion that her relationships with A.P. and L.R. constituted cause for her dismissal was against the manifest weight of the evidence and should have been reversed by the trial court. Specifically, she argues that her relationship with A.P. before her high school graduation was entirely proper and further that her conduct with A.P. after graduation when A.P. ceased being a student, while in point of fact remaining proper, became irrelevant. She also contends that her conduct and interaction with L.R., while entirely proper, occurred essentially outside of school grounds and, further, that she should not be penalized for false rumors regarding that relationship which spread as a result of totally fabricated accusations concerning the alleged June 15, 1983, incident. She further contends that even if cause were present, it was remediable and first required a written warning.

■■■ In order to encourage experienced and able teachers to remain within the educational system and to insure that rehiring decisions will be based on merit and not upon political, partisan or capricious reasons, the School Code provides for the removal of tenured teachers only for cause. (Ill. Rev. Stat. 1987, ch. 122, par. 34—85; *Szabo v. Board of Education of Community Consolidated School District 54* (1983), 117 Ill. App. 3d 869, 873, 454 N.E.2d 39, 42.) Though the School Code does not define "cause," section 10—22.4 of the Code does provide some guidance by providing for dismissals of teachers for "incompetency, cruelty, negligence, immorality or *other sufficient cause* ***." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 122, par. 10—22.4.) Additional guidance may be found in case law, which has defined "cause" as " 'some substantial shortcoming which render[s] continuance in *** office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as good cause for *** not longer occupying the place.' " (*Jepsen v. Board of Education of Community High School District No. 307* (1958), 19 Ill. App. 2d 204, 207, 153 N.E.2d 417, 419, quoting *Murphy v. Houston* (1928), 250 Ill. App. 385, 394.) Case law further requires that the conduct which forms the

basis for claiming cause must bear some relationship to a teacher's ability to perform her job. (*Chicago Board of Education v. Payne* (1981), 102 Ill. App. 3d 741, 747, 430 N.E.2d 310, 315.) The school board has the right, in the first instance, to determine what constitutes cause, using the best interest of the school as a "guiding star." *Payne*, 102 Ill. App. 3d at 747, 430 N.E.2d at 314.

██ █ Our duty on review is to examine the entire record to determine whether the school board's findings and conclusions are against the manifest weight of the evidence. (*Board of Education of Tonica Community High School District No. 360 v. Sickley* (1985), 133 Ill. App. 3d 921, 924, 479 N.E.2d 1142, 1145.) If they are not against the manifest weight of the evidence, we must affirm. (See *Jepsen v. Board of Education of Community High School District No. 307* (1958), 19 Ill. App. 2d 204, 153 N.E.2d 417.) However, when conduct which forms the basis for the dismissal of a tenured teacher is *remediable*, the School Code requires that a school board first give the teacher "reasonable warning in writing, stating specifically the causes which, if not removed, may result in charges." (Ill. Rev. Stat. 1987, ch. 122, par. 34—85.) A failure to provide such a written warning warrants a reversal. *Board of Education of School District No. 131 v. State Board of Education* (1983), 99 Ill. 2d 111, 457 N.E.2d 435.

Accordingly, we must first consider the administrative finding below with respect to the existence of cause. If we conclude, as we do, that the administrative finding with respect to cause was not contrary to the manifest weight of the evidence, we must and shall then consider whether such cause was remediable.

WAS THERE CAUSE?

A. RELATIONSHIP WITH A.P.

██ Even though the hearing officer disbelieved the evidence to support the more serious charges against' plaintiff, namely, the charges involving sexual contact and interaction between the plaintiff and A.P., we cannot say that his conclusion that the remaining lesser charges pertaining to plaintiff's relationship with A.P. constituted cause was against the manifest weight of the evidence.

We find sufficient evidence in the record to support the hearing officer's conclusion that plaintiff had used her professional position to develop a personal relationship with A.P. Though the record discloses that the relationship began while A.P. was a student in plaintiff's class, the nature of that relationship would indicate that it exceeded

the professional bounds of that of teacher to student. Notwithstanding plaintiff's statement that she "wanted to be someone who would be there in case no one else possibly could be there," the evidence does not sustain this to be the complete *raison d'etre* for her relationship with the girl. This relationship with A.P. cannot be equated to the admirable efforts of the schoolteacher in the Welsh mining town portrayed in Emlyn Williams' play, "The Corn is Green," to provide encouragement, guidance and intellectual stimulus to a gifted young person who, without the teacher's personal intervention, would be abandoned to the lifelong hardship and intellectual desolation that characterized life in a Welsh coal mine at that time. There is no indication that A.P. had any urgent educational or personal need which warranted the personal intervention and ensuing relationship which developed between plaintiff and A.P. while A.P. was still a student. The girl was already one of the top students in plaintiff's class and although she shared many of the problems common to teenage young women, she apparently was not without a family support system to help her with those problems.

Though there was some contradiction between the testimony of A.P. and plaintiff over various aspects of the early part of their relationship when A.P. was still a student, there was sufficient evidence of outings and home visits arranged by plaintiff and gifts and other special favors provided by plaintiff to indicate that plaintiff had become too personally involved in her relationship with A.P. without holding fast to the discipline and restraint of professionalism.

Two incidents which occurred before A.P.'s graduation, although not cataclysmic, nevertheless demonstrate how even at that time plaintiff permitted her personal involvement with A.P. to override her professional judgment. The first involved the award of the table prize at the senior luncheon. Plaintiff acknowledged that she bypassed the chance element in awarding the prize by deliberately seating A.P. in the prize-winning chair to reward her for her help during the year. Though this incident is mitigated somewhat by the circumstances surrounding the award of this prize, it is clear that such intentional conduct by a teacher is not an appropriate or acceptable educational example to set for her students. The second involved plaintiff's sending a letter with extra graduation tickets to A.P., asking A.P. when she was going to start doing nice things for plaintiff. Although this letter was never offered into evidence, the hearing officer found that such a letter had been sent by plaintiff and was evidence of the close friendship between plaintiff and A.P. We agree with the hearing officer that, within the context of this case, such a request coming from a

teacher to a student is neither advisable nor appropriate. Though an appreciative student might spontaneously be motivated to give a teacher a small favor or gift, it is unprofessional for a teacher to openly request such reciprocity, which plaintiff here appeared to do. It can clearly be viewed as a demonstration of excessive personal involvement with that student.

Further evidence of plaintiff's unprofessional conduct involving A.P. can be found after A.P.'s graduation. The evidence shows that almost immediately after the graduation, plaintiff invited A.P. to spend the night at her house. On several additional occasions during this period, mostly at plaintiff's invitation, albeit with the apparent approval of A.P.'s parents, A.P. spent the night at plaintiff's home. Though the hearing officer did find that it was probable that on some occasions A.P. told her parents that she was spending the night at plaintiff's home when she was actually sleeping with her boyfriend, plaintiff herself testified to approximately two additional overnight stays other than the one occurring immediately after graduation. The evidence is undisputed that in one such instance, occurring in September, she and A.P. shared the same bed, albeit, according to plaintiff, because of A.P.'s alleged fear of plaintiff's housepets. Though the hearing officer did not find any improper conduct occurring at that time, we agree with the hearing officer that this is an additional circumstance which would help support a finding that the personal relationship between plaintiff and A.P. became excessive.

There was testimony that during this period after graduation, plaintiff and A.P. communicated daily by telephone, with plaintiff and A.P. equally likely to place the calls, to discuss subjects ranging from A.P.'s college experience and future plans to birth control methods. On other occasions, plaintiff and A.P. would dine out or go on shopping trips together. On those occasions, plaintiff or her husband, when present, would always pay for A.P.'s way. Additionally, during this period of their relationship, plaintiff sent A.P. numerous cards and letters, expressing affection and encouragement to A.P. And, she continued to make numerous small gifts to A.P., including one item of lingerie. This evidence, cumulatively, if not individually, would suffice to support the hearing officer's findings of cause with respect to plaintiff's relationship with A.P.

■ Plaintiff argues that she should not be held to account for her conduct with A.P. after A.P. graduated even if that conduct were improper, which she denies. There is considerable merit to this argument since after graduation there was no longer a teacher-student relationship to be maintained with the commensurate duties and

responsibilities which a school and faculty share towards matriculating students. Moreover, none of the aspects of plaintiff's conduct towards A.P. after graduation occurred on school premises but was totally private. (See *Morrison v. State Board of Education* (1969), 1 Cal. 3d 214, 461 P.2d 375, 82 Cal. Rptr. 175.) Nor was any evidence introduced to bring into focus whether any of this post-graduation conduct would render her unfit to teach ongoing students. (See *Chicago Board of Education v. Payne* (1981), 102 Ill. App. 3d 741, 430 N.E.2d 310.) But, on balance, we hesitate to hold the hearing officer's conclusion to consider this post-graduation conduct in his assessment of cause to be against the manifest weight of the evidence, since this conduct followed closely the relationship which started while A.P. was still plaintiff's student at Lucy Flower, albeit late in the final semester of her senior year.

In *Goldin v. Board of Education of Central School District No. 1* (1974), 35 N.Y.2d 534, 364 N.Y.S.2d 440, the New York Court of Appeals considered the closeness in time between the post-graduation conduct of a male high school counselor and one of his female, former students and her high school graduation date to be significant in determining that at least at an early stage of the litigation, it would be inappropriate to rule out consideration of such conduct in disciplinary proceedings against the counselor. In *Goldin*, the counselor was suspended on the basis of a charge that he had slept with the 18-year-old former student within two months of her high school graduation. Though the counselor argued that his constitutional right to privacy would be violated if the conduct alleged in this charge were used as a basis for his discipline, the New York court rejected that argument, noting:

> "[T]he period of time since the former student was graduated (less than two summer months) was so short that, without clear evidence of no prior association, the availability of practical, realistic inferences is such as to make judicial foreclosure of further inquiry inappropriate, particularly at the threshold, pre-hearing state of the disciplinary proceedings." *Goldin*, 35 N.Y.2d at 544, 364 N.Y.S.2d at 446.

We must emphasize here, however, that although we find that this post-graduation conduct may be considered albeit, tenuously, in determining cause, these same considerations will have to be reassessed with regard to the question of remediability.

B. RELATIONSHIP WITH L.R.

■ As with A.P., even though the hearing officer disbelieved the

evidence to support the most damaging charges against plaintiff, involving the accusations of sexual contact or interaction between plaintiff and L.R., we find sufficient evidence in the record to support the hearing officer's conclusion that plaintiff had sought out, encouraged and participated in an inappropriate personal relationship with L.R. on school grounds. Granted the relationship with L.R. differed from the one with A.P. in that L.R. was never plaintiff's student and the relationship itself had been expressly endorsed by L.R.'s parent. However, it too, as in A.P.'s case, was a relationship which can be held to have developed as a result of plaintiff's misdirected use of her professional position as a member of the school faculty to develop a personal relationship with a student at that school even though L.R. was not plaintiff's personal student. Like the situation with A.P., there is no indication that L.R. required any special attention as a student or that she had special personal needs which warranted such special attention from a teacher at Lucy Flower.

The evidence shows that their relationship began when the girl either telephoned the teacher outside of class to seek her advice or approached her in the gymnasium. Thereafter, plaintiff's relationship with L.R. quickly developed into one evidenced by their handholding, the trips to restaurants which were all paid for by plaintiff, the numerous gifts and cards which plaintiff gave to L.R., the overnight stays at plaintiff's home, and the amount of time spent alone together at school.

Plaintiff argues that her activities with L.R. occurred outside of school for the most part and are therefore protected private conduct. The record, however, belies that argument. Much of the conduct with L.R. occurred on school grounds or close enough to school grounds as to become known to members of the school community. In particular, the evidence shows that the handholding, the rides, the giving of several gifts, and a good portion of the time they spent with each other all either occurred or were observed on school premises.

As the hearing officer found, one of the more significant aspects of plaintiff's personal relationship with L.R. was that it continued on school grounds even after the false rumors started circulating about the alleged June 15, 1983, incident. The record shows that plaintiff herself became aware of the rumors early on and that her superior, Hortense Bright, advised her of the rumors and accusations regarding that incident and regarding her alleged misconduct with an unidentified former student as early as September of 1983. Yet, despite this knowledge of these rumors, plaintiff saw fit to continue to maintain her personal relationship with L.R. on the school premises. Though it

is clear from the record that the rumors regarding the nature of their relationship originated with the allegations about the June 15 incident and not with plaintiff's subsequent activities with L.R., we agree with the hearing officer that plaintiff's apparent refusal to be concerned about the possible continued life she would give to these rumors by maintaining this relationship could be viewed as a serious lapse of professional judgment.

Plaintiff also argues that her conduct with L.R. on school premises should not constitute cause for dismissal because: (1) there were no written rules against it; (2) other teachers at Lucy Flower did many of the same things she did without any disciplinary action resulting therefrom; and (3) she was being unfairly penalized for false rumors regarding her relationship with L.R. Though the fact that there were no written rules against engaging in personal friendships with current students is a mitigating factor (see *Board of Education v. State Board of Education* (1987), 160 Ill. App. 3d 769, 780, 513 N.E.2d 845, 851), it does not completely condone plaintiff's conduct. As an experienced teacher, plaintiff should have been able to recognize the professional standards which must guide a teacher's conduct without requiring written rules. Similarly, the fact that her conduct with L.R. was not unlike that of other teachers at Lucy Flower, a fact acknowledged by even two of her major detractors, S.W. and Armstrong, mitigates the inappropriateness of that conduct. That fact alone, however, does not obviate the necessity to exercise independent judgment. As found by the hearing officer, such an exercise of independent judgment and restraint became all the more important when plaintiff became aware of the false accusations and rumors involving the June 15 incident. Though the hearing officer did find that the alleged June 15, 1983, incident with L.R. was unproven, he nevertheless found cause in plaintiff's failure to discontinue her relationship with L.R. in the face of the unsubstantiated rumors concerning the June 15 incident. We cannot conclude that such a finding was against the manifest weight of the evidence, regardless whether those activities did or did not independently foment rumors.

In arriving at our conclusion that the hearing officer's finding of cause was not against the manifest weight of the evidence, we are not unmindful of the special demands which our continually changing society places on teachers. Teachers are called upon to perform many roles in helping to educate the children who are entrusted to them. The performance of these roles often does require spending additional time with particular students to aid them in their learning. Nonetheless, a teacher must be able to draw the line

between conduct which is necessary for the proper performance of her educative function and that which is or which degenerates into one which is primarily for her own emotional gratification. In the present case, there is sufficient evidence to support the finding that this line was clearly traversed.

WAS THE CAUSE REMEDIABLE?

Plaintiff next contends that even if her personal relationships with A.P. and L.R. constituted cause, it was remediable cause and the State Board had no jurisdiction to dismiss her because she had not been given the statutorily required written warning to allow her an opportunity to correct her conduct. She argues that she was entitled to a written warning because there was no showing that her conduct caused damage to either A.P. or L.R., the faculty or the school and, even if it did cause some damage, it was clearly correctable. We agree.

■■■■ As previously noted, when conduct which forms the basis for the dismissal of a tenured teacher is *remediable*, the School Code requires that a school board give the teacher written warning of the causes. (Ill. Rev. Stat. 1987, ch. 122, par. 34—85; *Reinhardt v. Board of Education of Alton Community Unit School District No. 11* (1974), 19 Ill. App. 3d 481, 311 N.E.2d 710, *vacated on other grounds* (1975), 61 Ill. 2d 92, 329 N.E.2d 218.) Conduct is deemed remediable if: (1) the conduct has not damaged the students, faculty, or school, or (2) the conduct could have been corrected had the teacher received the written warning. (*Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 153, 365 N.E.2d 322, 326.) "The degree of required damage is damage that is so severe as to justify dismissal absent service of a warning notice." (Kaplan, Comment, *A Question of Remediability: Standards of Conduct for Illinois Public School Teachers*, 29 De Paul L. Rev. 523, 531 (1980); see *Board of Education of School District No. 131 v. State Board of Education* (1983), 99 Ill. 2d 111, 119, 457 N.E.2d 435, 439; *Board of Education v. State Board of Education* (1987), 160 Ill. App. 3d 769, 776, 513 N.E.2d 845, 849.) Conduct which is initially remediable can become irremediable if continued over a long period of time. (*Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 153, 365 N.E.2d 322, 326.) Where conduct is remediable and the board has not given the required statutory warning to a teacher, a dismissal of that teacher is properly reversed because the board lacked jurisdiction to take such action.

(*Board of Education of School District No. 131 v. State Board of Education* (1983), 99 Ill. 2d 111, 457 N.E.2d 435; *Paprocki v. Board of Education of McHenry Community High School District No. 156* (1975), 31 Ill. App. 3d 112, 334 N.E.2d 841.) A reviewing court, however, will not overturn a school board's determination of irremediability unless "the Board has acted in an arbitrary or capricious manner or the reasons formulated for the dismissal were against the manifest weight of the evidence." (*Szabo v. Board of Education of Community Consolidated School District 54* (1983), 117 Ill. App. 3d 869, 872-73, 454 N.E.2d 39, 42.) We find that the hearing officer's determination of irremediability was against the manifest weight of the evidence because there was an insufficient showing that any of plaintiff's proven conduct significantly damaged either A.P. or L.R., the faculty or the school.

The defendant Chicago Board argues that damage was established by A.P.'s testimony on how she felt about her relationship with plaintiff, the testimony of A.P.'s parents regarding her condition after the alleged but unproven November 29, 1982, incident, the testimony of L.R. about how she felt concerning the rumors, the testimony of Dr. Moore, and testimony from various witnesses regarding the rumors which spread throughout Lucy Flower after the alleged but unproven June 15, 1983, incident. This evidence failed for various reasons to prove that plaintiff's conduct caused any of the claimed damage.

With respect to A.P., we initially note that since the greater portion of plaintiff's relationship with her occurred after she was no longer a student at Lucy Flower and outside school grounds, any evidence of damage to A.P. during that period would be of little or no consequence to a determination of whether plaintiff's conduct was irremediable because the requirement for such a showing is that there be damage to *students*, faculty or the school. Nonetheless, even if damage to A.P., a former student, were of consequence to the determination of irremediability, the record is devoid of any evidence demonstrating such damage. As the Chicago Board contends, A.P. did testify that as a result of her relationship with plaintiff, she "loved" plaintiff and felt that plaintiff was "a member of her family," but there is no evidence in the record that the expression of such indicates emotional or psychological harm to A.P. (See, *e.g., Board of Education v. Box* (1989), 191 Ill. App. 3d 31, 40, 547 N.E.2d 627, 633 (stating that if psychological damage to student is shown, the damage prong of the remediability test has been met).) A.P. also testified that she felt that plaintiff had become overly pos-

sessive about their relationship but, once again, there is no evidence in the record showing that she sustained emotional or psychological harm as a result of that fact even if it were taken as a true characterization.

The testimony of A.P.'s parents regarding her changed condition after the alleged November 29, 1982, incident also failed to show that plaintiff's conduct damaged their daughter because her condition was not related to any proven conduct of plaintiff, either while A.P. was a student or after her high school graduation, but instead was related to an alleged incident which the hearing officer specifically found did not occur. The father's testimony that his daughter was more subdued and lacked self-esteem and the mother's testimony that she was upset were directly attributed to the alleged November 29 incident. There is no indication from their testimony that these conditions were linked to any aspect of plaintiff's conduct, aside from the alleged November 29 incident which was disbelieved by the hearing officer and abandoned by the defendants on this appeal. Without any such indication it would be improper to charge these conditions to plaintiff's conduct. Just as it is improper to presume or infer damages (*Morris v. Illinois State Board of Education* (1990), 198 Ill. App. 3d 51, 57, 555 N.E.2d 725, 728), so too it is improper to attribute damage to conduct other than that which the evidence supports. Additionally, it would be improper to charge these conditions to plaintiff when one considers the real possibility that they could be attributable to the girl's unwanted pregnancy, about which she was admittedly upset at the time of the alleged November 29 incident and which the school board's expert, Dr. Moore, stated was capable of having a negative impact on her. In fact, in finding insufficient evidence to support the alleged November 29, 1982, incident, the hearing officer specifically noted that A.P.'s "lack of candor about her pregnancy casts a long shadow over her relationship with Hegener in November and December, 1982," the precise time periods when A.P.'s parents noticed her changed condition.

Nor can it be said that plaintiff's relationship with A.P. damaged Lucy Flower or its faculty. There is no evidence that this relationship had become the subject of any notoriety at Lucy Flower. The only evidence that any of the details of the relationship became known to anyone at Lucy Flower was testimony that Ruther McKitchen, A.P.'s mother, contacted Hortense Bright, the principal of Lucy Flower, and informed her only of the alleged November 29, 1982, incident. Moreover, Bright testified, and there is no contradic-

tory evidence, that nobody else at Lucy Flower even became aware of the details of that incident.

There also is no evidence of damage to L.R. resulting from her relationship with plaintiff. She did not testify that she was damaged, and no other witness testified that she, in fact, was damaged. Moreover, L.R.'s testimony regarding how she reacted to the rumors at school, including her need to ultimately transfer to another high school, fails to show any damage attributable to any wrongful conduct of the plaintiff. The significant fact is that L.R. testified that her reaction was to rumors which arose out of the serious accusations concerning the alleged June 15, 1983, incident. She specifically stated that teachers developed a negative attitude towards her and she became depressed *because of the rumors which arose from the alleged June 15 incident.* At no time did she testify that her reaction or feelings were in anyway related to any aspect of the conduct of plaintiff. In fact, she testified favorably about her relationship with the plaintiff and even her mother apparently approved of it. Absent any testimony that she was adversely affected by that relationship, it cannot be said that plaintiff's conduct caused her harm.

Nor, as defendant Chicago Board readily concedes in its brief, could Dr. Moore's opinions, based solely on two hypothetical questions, demonstrate actual adverse effects on either A.P. or L.R. since he never examined either student or, for that matter, any of the principals involved. Even if we were to accept the argument of defendant Chicago Board that we should nonetheless view Dr. Moore's testimony as "buttressing" evidence, any value attributable to his opinions is further limited because the hypothetical questions on which his opinions were exclusively predicated contained several significant facts which the hearing officer specifically found to be unproven.

■■ The general rule is that an expert's testimony is to be judged by the rules of weight and credibility applied to all other witnesses. (*Jones v. Consolidation Coal Co.* (1988), 174 Ill. App. 3d 38, 47, 528 N.E.2d 33, 39.) The weight and value of such testimony depends to a great extent upon the facts and reasons upon which the testimony is based. (See *Brendel v. Hustava* (1981), 97 Ill. App. 3d 792, 799, 423 N.E.2d 503, 509.) If assumed facts upon which an opinion is based are not borne out by the evidence, the opinion is entitled to limited weight. See *Waterford v. Halloway* (1986), 142 Ill. App. 3d 668, 674, 491 N.E.2d 1199, 1203.

■■ The hypothetical question concerning L.R. included hypo-

thetical facts which treated as true the serious accusations about the alleged June 15 incident and the charges of instances of kissing and fondling, all of which the hearing officer found to be unbelievable. Though Moore did state in his opinion that he was concerned with the undue influence plaintiff exerted in the relationship with L.R., there can be no question that these serious sexual accusations played a significant role in the formation of the opinion. It is clear from Moore's testimony regarding this hypothetical that he was concerned with those features of the relationship which would impinge on the formation of L.R.'s sexual identity. In his opinion, he noted that the girl was then in a stage in which she was "struggling with *** sexual identity." He also noted that the undue influence which plaintiff exerted "would tend to attract on the one hand *in a rather seductive fashion* of the child and cause the child to have not a great deal of ability to withstand the pressures that were associated with this." Further evidence of this concern with the alleged sexual aspects of this relationship is evident from his general statement regarding both relationships that what he considered destructive *other than the physical contact* was "[t]he quality of the relationship in terms of the holding of hands, *the kissing, the stroking*, the gifts." (Emphasis added.) In light of this clear indication of the importance of those alleged physical contacts in the hypothetical, we cannot agree with the hearing officer that Moore's opinion would not have been different without these serious accusations of physical contact in the hypothetical. Thus, we must give Moore's opinion regarding the effect on L.R. limited value.

We also believe that Moore's opinion regarding the destructive impact of plaintiff's relationship with A.P. on the girl's development should be given limited weight. Though Moore did testify that his opinion was predicated not just upon the alleged November 29, 1982, incident but upon "the total hypothetical," it is uncertain what his opinion would have been had the hypothetical not included this alleged fact. The allegation of the November 29 incident was most serious, with criminal implications if proven, and not one which would normally be considered to be insignificant. Also, it is unclear what his opinion would have been had the hypothetical not included the fact that the girl and defendant customarily shared the same bed whenever A.P. would remain at plaintiff's home overnight, a fact which the hearing officer rejected when he stated he had "grave doubts" of the truth of that assertion. As noted in connection with the relationship with L.R., when Moore was asked what he found destructive about these relationships other than the

physical contact, he responded by listing four things, three of which constituted physical contact. Thus, there can be no question that his opinion would have been significantly impacted by the incorporation into his hypothetical question of the rejected charges that plaintiff engaged in sexual improprieties and close physical contact with A.P.

■■■ The only other evidence of claimed damage resulting from plaintiff's conduct was testimony regarding damage caused to the school as a result of the various rumors which spread throughout the school about the relationship between L.R. and plaintiff. As previously indicated, the hearing officer found that plaintiff's conduct with L.R. was primarily actionable because it exacerbated existing "mostly unfounded" rumors and controversy. It is clear from the record that these rumors originated with the alleged but unproven June 15, 1983, incident which was fomented to a great extent by (1) the September 1983 oral and November 29, 1983, written charges about that incident by Phyllis Banks, who was found to have strong personal and professional animosities toward plaintiff, (2) the apparent ongoing feud between Banks and plaintiff which led to frequent repetition of Banks' November 29 charge, and (3) the alleged but unproven charges of other sexual improprieties with L.R. reported by Robert Ogilvie to Banks alleging mouth kissing and fondling, which charges were rejected by the hearing officer after characterizing Ogilvie as a "totally unbelievable" witness. The hearing officer found that plaintiff, by maintaining a relationship with L.R. in the midst of the rumors, had damaged the school. We conclude that this finding is against the manifest weight of the evidence in this case.

In assessing the hearing officer's finding of damage to the school, it is important to first note that the hearing officer did not find that plaintiff's actual, proven conduct with L.R. independently damaged the school. The absence of such a finding is consistent with the evidence in this case. Even though plaintiff maintained a personal relationship with L.R. prior to the unproven June 15 incident, there is no evidence of any adverse rumors regarding plaintiff's conduct with L.R. originating prior to that alleged June 15 incident. Moreover, the record reflects that plaintiff's proven conduct with L.R. was not unlike the conduct of other teachers with other students at Lucy Flower and a finding that plaintiff's conduct with L.R. was independently damaging to the school would appear to be inconsistent with the absence of any evidence that any of these other teachers were disciplined or sanctioned for engaging in similar conduct.

The defendant Chicago Board, however, maintains that plaintiff's continued relationship with L.R. exacerbated the existent, albeit false, rumors concerning her. No explicit evidence of any such exacerbation was introduced. Moreover, if one is to speculate on the question of exacerbation, we must equally speculate that if plaintiff had ceased any relationship with L.R. in the face of the rumors, her cessation would have been viewed as an admission that she had engaged in an improper relationship and thus lent added credibility to the charges.

■ Aside from the dearth of evidence to establish any exacerbation of already existent rumors regarding the unproven June 15 incident, the pivotal question is whether plaintiff's conduct with L.R. not only contributed to the rumors, but also, the extent to which such exacerbation would have damaged the school. For, "[i]t is not enough *** to show that some damage occurred. The damage must be significant before the conduct causing the damage can be declared irremediable." (*Board of Education v. State Board of Education* (1987), 160 Ill. App. 3d 769, 776, 513 N.E.2d 845, 849; see *Board of Education of School District No. 131 v. State Board of Education* (1983), 99 Ill. 2d 111, 457 N.E.2d 435; *Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 388 N.E.2d 398.) We find no basis in the record for reaching such a conclusion. There is no evidence in this case that plaintiff's proven conduct caused significant damage to the school. In fact, Hortense Bright's testimony that as a result of the altercation between Banks and plaintiff over the alleged June 15 incident the climate at school was "terrible" would suggest that any significant damage to the school would have been caused by that alleged incident of June 15. Given the sensationalistic nature of the unproven charges regarding the alleged June 15 incident, the various unproven sensationalistic charges made by Robert Ogilvie and the ongoing feud between Banks and plaintiff as compared to plaintiff's actual, proven conduct with L.R., it would appear that plaintiff's proven conduct with L.R. would at best only have contributed minimally, if at all, to the rumors. This supposition is bolstered by the fact that the hearing officer made no finding that plaintiff's actual, proven conduct with L.R. independently caused damage and by the further fact that similar types of conduct had been prevalent at the school with no apparent damage resulting to the school. Moreover, it also is impossible to determine from the record in this case the extent to which the rumors were prolonged by school authorities' failure to act more quickly in establishing peace among its teachers.

Though we are mindful of the deference to be given to an administrative body on findings (*Szabo v. Board of Education of Community Consolidated School District 54* (1983), 117 Ill. App. 3d 869, 872-73, 454 N.E.2d 39, 42), we cannot say that the hearing officer's finding of damage is supported by the manifest weight of the evidence. Aside from Dr. Moore's opinions, which could not show actual adverse effect on A.P. or L.R. and which are premised on hypotheticals containing serious, unsubstantiated accusations, there was no other evidence of significant damage which can fairly be attributable to plaintiff's conduct.

■■ The defendant Chicago Board argues a variation of the principle that once remediable conduct may become irremediable if continued over a long period of time by stating that this conduct was irremediable because plaintiff admitted it was no different than other relationships she had with numerous other students over the years. In considering this argument, we must point out that the mere continuation of conduct for a period of years does not make once remediable conduct irremediable. (See *Morris v. Illinois State Board of Education* (1990), 198 Ill. App. 3d 51, 58-59, 555 N.E.2d 725, 729-30.) As noted by one commentator:

> "[L]ength [of time] alone is insufficient to transform remediable causes into irremediable ones, particularly where a board has 'sat idly by,' allowing remediable causes to become irremediable. School officials cannot disregard their own responsibility to warn a teacher of deficient, remediable conduct and then suddenly notice the deficiencies after they have become irremediable. If this practice were permitted, a board could evade the requirements of a warning notice and dismiss a teacher for irremediable conduct simply by its own inaction. Rather, a school board has an obligation to investigate its teachers' conduct and, where remediable, to serve a teacher with a warning notice." Kaplan, Comment, *A Question of Remediability: Standards of Conduct for Illinois Public School Teachers*, 29 De Paul L. Rev. 523, 533 (1980).

■■ Under the facts of the present case, there are two problems with defendant's argument. First, plaintiff was not charged with unprofessional or inappropriate conduct involving any other students. The charges which were brought dealt solely with A.P. and L.R. If defendant is now arguing that plaintiff also should be charged with engaging in unprofessional and inappropriate conduct with other students, then the charges as stated would be insufficient because they do not fairly apprise her of the claimed deficien-

cies so that she can refute them. See *Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 388 N.E.2d 398.

██ Second, even if plaintiff had been advised that these other relationships with other students were part of her claimed deficiency, cases which deal with the principle of once remediable conduct becoming irremediable conduct require some continuing warning that the conduct in question was inappropriate. (See, *e.g.,* *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 365 N.E.2d 322; *McCutcheon v. Board of Education* (1981), 94 Ill. App. 3d 993, 419 N.E.2d 451.) For example, in *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 365 N.E.2d 322, a teacher's conduct which was once remediable had become irremediable because it continued for over four years. In that case, however, there were numerous and ongoing parental complaints resulting in discussions between the teacher and her superiors concerning that conduct. There is no indication in the record that plaintiff ever was notified that her relationships with these other students needed to be corrected. On the contrary, this fact and the fact that other teachers engaged in similar types of relationships or activities with students, without any discipline or other expression of disapproval by school authorities, would tend to indicate that these relationships were not considered to be inappropriate. Nor is there any indication in the record of any adverse impact on these other students or on plaintiff's fitness to perform as a teacher. All the record discloses is that several of these students testified favorably regarding these relationships and plaintiff always graded high as a teacher while at Lucy Flower, obtaining the highest possible grade in the Chicago public school system in her last four years there. Under such circumstances, it cannot be said that once remediable conduct has been transformed into irremediable conduct.

██ We also find the conduct remediable because defendants have failed to meet their burden of showing that even if there was damage, plaintiff's conduct was not correctable. Defendants have failed to demonstrate that plaintiff could not stop engaging in personal relationships with students even if given the proper written warning. They argue that the fact that she has for many years engaged in these personal relationships with students suggests that a warning would be futile. The statute requiring such a warning (Ill. Rev. Stat. 1987, ch. 122, par. 34—85) makes no exception for in-

stances where the school board deems such warning "futile." However, even if futility would obviate the need to warn, there is no basis to assume that a written warning would have no impact. It is precisely because such conduct was longstanding and widely practiced at the school by other teachers as well that the conclusion of futility is unwarranted. Never until plaintiff's confrontation with Banks was any attempt made at the school to check such conduct. Surely it is by no means plausible that under these circumstances a written warning from the school board would be unheeded.

Defendant Chicago Board also argues that the fact that plaintiff did not change her relationship with L.R. after her September 1983 meeting with Hortense Bright indicates that a warning would be futile. We note that Bright merely addressed the charges arising out of the alleged June 15, 1983, and November 29, 1982, incidents at that meeting, without even going into the details regarding the latter incident. Since the hearing officer found insufficient evidence of these charges, plaintiff cannot be charged with continuing that which the evidence did not support as ever having occurred.

A warning would appear to be particularly appropriate in this case, where the Board is apparently taking a new position on relatively widespread conduct of which it previously had tacitly approved or to which it had apparently turned a blind eye.

As previously indicated, the State Board was justified in finding that plaintiff's personal relationships with L.R. and A.P. constituted cause. Nonetheless, since there was insufficient proof of any significant damage resulting from her conduct and, moreover, that any was not correctable, plaintiff, as a tenured teacher, was entitled to the statutory written warning to correct, if she could, her remediable conduct. Having not received such a warning, she could not be dismissed. *Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 388 N.E.2d 398.

For the foregoing reasons, we reverse the order of the circuit court of Cook County.

Reversed.

COCCIA and MURRAY, JJ., concur.